STATE of Minnesota, Respondent,

v.

**Billy Richard GLAZE, Appellant.**

No. CX–89–583.

Supreme Court of Minnesota.

March 16, 1990.

Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Thomas L. Johnson, Lee W. Barry, Sr. Hennepin County Atty., Appellate Section, Minneapolis, for respondent.

POPOVICH, Chief Justice.

Defendant Billy Richard Glaze was found guilty by a jury of three counts of first degree murder and three counts of second degree murder for intentionally killing three women while committing perimortem sexual assaults and was sentenced to three consecutive terms of life imprisonment. On appeal, Glaze seeks either an outright reversal on the ground the evidence was insufficient or a new trial because of the cumulative effect of trial errors. We affirm.

I.

On July 27, 1986, three transients discovered the body of a Native American woman in the brush under a tree near a railroad warehouse at 10th and Holden in Minneapolis. Police officers found the woman lying on her back wearing only socks, and a blouse and bra that were pushed up onto her shoulders. A pair of black pants was lying over her right arm, two tennis shoes were nearby, and bloodstained underwear was beneath her. A three-foot-long metal pipe was lying across her throat and a stick or small branch was protruding from her vagina. A Hennepin County detention slip issued to Kathleen Bullman was found inside one of her socks. An autopsy indicated the cause of death was lack of oxygen to the brain due to pressure on the neck, with facial trauma as a contributing factor. Circular lacerations and abrasions on Bullman's face, neck and abdomen were consistent with the pipe found on her throat. Her mouth was badly injured, with many broken teeth. An internal examination showed the stick had penetrated her vaginal wall and entered her abdominal cavity, although no injury to the external genitalia was present. The medical examiner opined the stick was inserted perimortem—around the time of Bullman's death.

On April 12, 1987, George Big Bear reported finding the body of a Native American woman in back of the American Indian Center at Franklin and Bloomington Avenues in Minneapolis. Police officers found the woman, later identified as Angeline Whitebird Sweet, naked except for a red bandana around her neck, on her back with her legs in a "stirrup" position. Her face, chest and arms were covered with blood and a tree branch was sticking out of her vagina. A shoe print was visible in the blood on her chest and a bloodstained wooden slat lay near her body. Clothing, which apparently belonged to Sweet, was found nearby. An autopsy indicated the cause of Sweet's death was lack of oxygen, in part the result of trauma to her head. Sweet suffered multiple blunt-instrument traumas to her head, her mouth was lacerated with numerous dental injuries, and she had bruises on her arms. A tree branch had been thrust into her vagina more than once, penetrating the vaginal wall and bladder, entering the abdominal cavity and bowel, and lacerating her liver. Although the branch was inserted while Sweet was dying, there was no injury to the external genitalia.

Ronald Blankinship discovered a body on April 29, 1987, under the Park Avenue railroad bridge in Minneapolis and called the police. Officers found the naked Native American woman, subsequently identified as Angela Green, lying on her right side with her knees bent. The back of her head was crushed and a large piece of bamboo was protruding from her vagina. Several pieces of concrete and a large bloodstained cinder block lay near her body. Green's clothing was found hanging from nearby trees. The autopsy indicated the cause of death was traumatic head injuries. Green had numerous lacerations and bruises on her face and head, her lip was torn, two teeth were missing and her skull was fractured. Injuries to her back were consistent with the shape of the bricks found at the scene. The bamboo stick penetrated Green's vaginal wall and uterus and entered her abdominal cavity. The medical examiner opined the stick had been inserted near the time of death and was moved about inside Green's body.

Shortly after Green's death, the Minneapolis Police Department formed a task force to investigate the murders. The task force had no leads until May 4, 1987, when Rae Flugge reported that a man named Jesse Coulter, a frequent customer in the Band Box Cafe in Minneapolis where she waitressed, might be a suspect. It was later learned that Jesse Coulter, whose real name is Billy Richard Glaze, also went by the name Jesse Sitting Crow.

Lois Morrison, who lived with Glaze, told the police during an investigative interview that Glaze left Minnesota on May 2, 1987. Although in a phone conversation Glaze asked her not to tell anyone where he was, Morrison informed the police he was in New Mexico. Minneapolis officials notified New Mexico authorities of their investigation and, on May 24, 1987, Glaze was arrested in Albuquerque for a traffic offense. Glaze was returned to Minnesota where he voluntarily submitted hair, blood and saliva samples to the authorities for testing.

Several people testified they heard Glaze frequently make derogatory statements about Native American women in general, as well as specific statements expressing his desire or intent to sexually assault them with knives, sticks and other objects. A television reporter, Bernard Grace, interviewed Glaze in June 1987. Grace testified Glaze told him he had been fascinated with Native Americans all his life, lied about being a Native American, admitted he lied frequently and denied committing the murders. In his interview with Grace, Glaze denied making any derogatory statements about Native American women. On appeal, Glaze also points to testimony that he never had a nice thing to say about anybody, not just Native American women.

Testimony at trial indicated Glaze was acquainted with each of the victims. Three individuals saw Glaze with Bullman at various times; Sweet brought Glaze to one individual's home; and one individual saw Glaze standing next to Green at a bar the night before or the night of her murder.

Distinguishing relevant physical evidence at the crime scenes was difficult because each of the murders occurred in a debris-littered transient area. Glaze's fingerprints were not found on any of the items seized from the scenes that were printed. Tests performed on the semen, saliva and hair samples found on or near the victims did not implicate Glaze. Hair in a black "Coors Light" hat recovered from the Green murder scene was "Negroid" and "did not come from Billy Glaze." Testimony at trial indicated Green worked for a Black pimp who was seen wearing a black hat with a "Coors Light" logo. Sweet had the same blood type as Glaze, but they had different enzyme types. Typing done on bloodstains recovered from the Sweet scene indicated two samples consistent with either Sweet or Glaze; two samples consistent with Sweet but not Glaze; and one sample not consistent with either Sweet or Glaze.

In April 1987, Glaze gave Morrison a pearl ring. The ring was identified at trial as similar to one owned by Green and several individuals testified they believed Green was wearing the ring the day she was murdered. Glaze, however, told Morrison he bought the ring in a bar.

Enlarged photographs of shoe prints found in the sand near Green's body indicated the word "TRAX" on the sole.[1] Police officers determined this brand is sold exclusively at K–Mart stores and concluded, based on measurements, the print was consistent with a size ten shoe. Morrison testified Glaze bought a pair of size ten tennis shoes at K–Mart in April 1987.

Leroy Hamblin, an inmate at the Stillwater Correctional Facility, testified that while he was drinking on July 27, 1986, with other transients at a camp located near 10th and Holden in Minneapolis he witnessed a woman's murder. He identified Glaze, whom he had previously met, from photographic lineups and at trial as the murderer. Hamblin had already seen a photo of Glaze before being interviewed by the police. He also recognized the murdered woman as a Native American woman he had seen at a bar earlier that evening. In June 1987 Hamblin discussed a newspaper article about the serial killings with Al Gettle, another inmate. Hamblin told Gettle he met a man in Montana who had had a dream about the murder. The police interviewed Hamblin after Gettle notified them Hamblin might have information about the murders. Hamblin initially repeated his "dream" story to the police. When officers confronted Hamblin with information that refuted this story, he admitted he lied and then claimed he had actually witnessed Bullman's murder.

In December 1987, while an inmate at the Hennepin County workhouse, Kevin Broen read a newspaper article about the murders, which contained a photograph of Glaze, and contacted the Hennepin County Attorney's office. Broen reported, as he testified at trial, that he had observed a man, whom he later identified as Glaze, standing on the bridge at 29th and Park in Minneapolis the morning of April 29, 1987. When Broen passed back over the bridge a half hour later, he observed Glaze still standing there. Green's body was found beneath the bridge a short time later. Broen testified he did not contact the police earlier because a warrant was out for his arrest.

Eric Forbes was incarcerated in the same Ramsey County jail unit as Glaze in May 1988, after Glaze was returned from New Mexico. Forbes testified Glaze made several sexual statements about women to him and also stated he hated "squaws." Forbes also testified Glaze showed him a newspaper article about the murders containing a quotation from Minneapolis Police Chief Tony Bouza that "[w]e should find [the murderer] and execute him." According to Forbes, Glaze then said he wanted to confess but was afraid he would be executed. Deputy Kim Swirtz testified Glaze told her he was supposed to be transferred to a single jail cell "because I'm the serial killer."

In September 1988, Glaze was incarcerated at the Hennepin County detention center

---

1. The shoe print found in the blood on Sweet's body apparently was not identified.

with Gary Branchaud. Branchaud testified Glaze told him, "I can't believe I killed them. I killed them with my hands." Branchaud later wrote in a note to Glaze, "Billy, don't let anyone know about your case like that." Glaze returned the note to Branchaud after writing on it, "Don't let anyone hear you, but not to let anyone know, I killed them. I was mad at them." Defense counsel stipulated at trial to testimony from the Bureau of Criminal Apprehension handwriting expert that this note and others given to the police by Branchaud were written by Glaze.

Branchaud also testified Glaze gave him a book entitled *Murphy* about a sheriff tracking a serial killer. According to Branchaud, Glaze underlined passages in the book and said the book was about the things that he was being accused of. Counsel also stipulated to testimony from the BCA handwriting expert that one latent fingerprint was located on the book and was positively identified as a fingerprint of Gary Branchaud. In exchange for Branchaud's "truthful, complete and accurate [testimony] about his contacts with" Glaze, an agreement was entered whereby the state dismissed theft charges against Branchaud and he pled guilty to other charges for which he received a probationary sentence.

Glaze was indicted by a Hennepin County grand jury on three counts of premeditated murder in the first degree (Minn.Stat. § 609.185(1) (1988)) and three counts of murder in the first degree during a sexual assault (Minn.Stat. § 609.185(2) (1988)) for the deaths of Bullman, Sweet and Green. Glaze did not testify at trial. A jury convicted him of first degree murder during a sexual assault and the lesser-included offense of second degree intentional murder (Minn.Stat. § 609.19(1) (1988)) for each of the deaths. Glaze was sentenced to three consecutive terms of life imprisonment. Glaze appeals his convictions, seeking either an outright reversal on the ground the evidence was insufficient or a new trial because of evidentiary and procedural errors. We affirm.

II.

Glaze seeks an outright reversal of his convictions on the ground that the state failed to prove beyond a reasonable doubt he was the person who murdered the three women. This assertion requires us to review the trial record to determine whether, looking at the evidence and the inferences to be drawn therefrom in the light most favorable to the verdict, there was a sufficient basis for a properly instructed jury to reasonably conclude the defendant was guilty beyond a reasonable doubt of the offenses for which he was convicted. *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981). Having done that, we conclude the evidence identifying Glaze as the murderer of the women was sufficient.

The record contains evidence, which the jury was free to credit, that Glaze made not one but a number of highly self-incriminating statements: a) In June 1987, a little over a month after the last murder, Glaze talked with a television reporter, Bernard Grace. Although Glaze denied committing the murders, he said that he had been fascinated with Native Americans all his life and had lied about being one. b) In May 1988, after he was returned to Minnesota from New Mexico, Glaze told Eric Forbes, a fellow inmate at the Ramsey County jail, that he hated "squaws" and made several statements of a sexual nature about women. Showing Forbes a newspaper article about the murders, Glaze said he wanted to confess but was afraid he would be executed if he did. c) Contemporaneously, Glaze told a sheriff's deputy that he was supposed to be transferred to a cell for one person "because I'm the serial killer." d) In September 1988, while an inmate at the Hennepin County detention center, Glaze told a fellow inmate, Gary Branchaud, "I can't believe I killed them. I killed them with my hands." Glaze later wrote a note to Branchaud in which he admitted killing the women because he was "mad at them."

It is hornbook law, codified at Minn.Stat. § 634.03 (1988), that a person's uncorroborated confessions of guilt are not sufficient to support a conviction. As our state-

ment of facts makes clear, Glaze's numerous confessions and inculpatory statements were corroborated in a number of ways: a) First, there was evidence that Glaze was acquainted with each of the victims. Three witnesses testified to seeing Glaze with Bullman at various times; Sweet brought Glaze to one witness' home; another witness saw Glaze standing next to Green in a bar shortly before her murder. b) Several people testified that Glaze frequently expressed his hatred of Native American women and his desire to sexually assault them with sticks, knives and other objects. c) Leroy Hamblin testified that he saw Glaze murder Bullman on July 27, 1986. d) Kevin Broen testified that he saw Glaze near the scene of Green's murder on April 29, 1987, about the time her murder is believed to have occurred. e) Glaze gave his girlfriend, Lois Morrison, a ring identified at trial as being indistinguishable from a ring Green was believed to have been wearing when she was murdered. f) Glaze was linked to shoe prints found in the sand near Green's body. g) Glaze fled the state on May 2, 1987, shortly after the last of the murders, instructing Morrison not to tell anyone where he was.

Given this and other evidence of guilt, we unhesitatingly conclude the evidence was sufficient to support the verdicts.

### III.

Glaze contends alternatively that, failing an outright reversal on the ground that the evidence was insufficient, he should be given a new trial because certain trial errors combined to deprive him of a fair trial. We note at the outset that evidentiary and procedural rulings generally rest within the trial court's discretion and will not be reversed absent a clear abuse of discretion. *E.g., State v. Ture,* 353 N.W.2d 502, 515–16 (Minn.1984); *State v. Olkon,* 299 N.W.2d 89, 101–02 (Minn.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). We are also mindful that "[c]onstitutional error is not reversible error, however, if it is found harmless beyond a reasonable doubt." *State v. Larson,* 389 N.W.2d 872, 875 (Minn.1986) (citations omitted). In determining whether an error warrants reversal, the test is "whether it is likely that the errors substantially influenced the jury to convict. The strength of the evidence is only one factor" the reviewing court considers. *State v. Carlson,* 268 N.W.2d 553, 561 (Minn.1978).

a) Three alleged errors concern the trial court's exclusion of evidence offered by the defense in an attempt to create a reasonable doubt by implicating people other than Glaze in the murders.

Near the end of trial, defense counsel was contacted by Kenneth Alexander, an inmate at Lino Lakes. Alexander stated that in April 1987, he was "shooting dope" with a man named Kerry Haukw, when Haukw claimed he was the one who killed the Indian women and was the one for whom the police were looking. Haukw was killed in a shootout with police in September 1987. The defense therefore sought to introduce evidence of Haukw's alleged confession as a statement against penal interest by an unavailable witness, an exception to the hearsay rule under Minn. R.Evid. 804(b)(3). The trial court ruled the alleged confession was inadmissible hearsay because it lacked requisite reliability. We agree.

Our cases dealing with the admissibility of statements against penal interest "require * * * more proof than the mere fact that another person has confessed to the same crime for which the defendant stands charged. * * * Because hearsay statements tending to exculpate the accused must be regarded with suspicion, * * * to be admissible, declarations against penal interest must be proven trustworthy by independent corroborating evidence that bespeaks reliability." *State v. Higginbotham,* 298 Minn. 1, 4–5, 212 N.W.2d 881, 883 (1973). As corroboration for Haukw's alleged statement, defense counsel offered to prove that Haukw lived near the scene of Green's murder and had been in Green's apartment. Defense counsel requested a continuance to try to locate prostitutes whom he hoped might testify that Haukw would stick the barrel of a firearm in their vaginas. Although the tri-

al court did not specifically rule on the continuance request, defense counsel did not renew this request nor submit a motion to bring the issue properly before the court. While the record contains no evidence indicating that either Alexander or Haukw had a motive to fabricate the alleged confession, the opposite is also true: the record contains no independent corroborating evidence that bespeaks the reliability of the alleged statement. Accordingly, the trial court did not abuse its discretion in excluding Haukw's alleged confession.

▌ The trial court, in granting a motion in limine by the state, also prohibited the defense from presenting evidence tending to connect one Michael Cooper to Green's murder. Specifically, the defense wanted to show that Cooper owned a hat similar to one found near Green's body, that he reportedly had raped Green at knifepoint, and that Green had given her sister a list of people she feared and the list included Cooper's name. The trial court ruled the evidence of Green's state of mind and the evidence of the alleged prior rape inadmissible.

Where identity of the murderer is at issue, as here:

> [E]vidence tending to prove that another person did the killing is admissible. The purpose of [such] evidence * * * is not to prove the guilt of the other person, but to generate a reasonable doubt of the guilt of the defendant. Proper foundation must be laid for the admission of such evidence, however, to avoid the consideration of matters collateral to the crime. * * * Once the necessary foundation is proven, it is permissible to introduce evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act.

*State v. Hawkins*, 260 N.W.2d 150, 158–59 (Minn.1977) (footnotes and citations omitted). We tend to agree with the defense that the evidence was admissible on the issue of the identity of the person who murdered Green. We note, however, that the evidence was not completely excluded.

The jury heard testimony that Green had a pimp who wore a "Coors Light" hat and that a similar hat was found at her murder scene. Further, although an attorney's remarks are not evidence, the jury learned from defense counsel in closing argument that Green was afraid of someone. Thus, the jury had before it information tending to link someone other than Glaze with Green's murder. Given the overwhelming evidence of Glaze's guilt, it is extremely doubtful that admission of more detailed evidence concerning Cooper's relationship with Green would have affected the verdict. Accordingly, any error by the trial court was harmless beyond a reasonable doubt.

▌ Defense counsel also wanted to present testimony regarding a fight between one Joe Foster and Angeline Whitebird Sweet the night she was killed, as indicative of a motive Foster may have had to kill her. The source of this information, however, one Phillip Foy, was unavailable. Glaze argues the hearsay evidence of Foy's statement regarding the alleged fight was admissible under *Hawkins* as tending to prove a third person murdered Sweet. *Hawkins*, however, does not abolish the rule against hearsay. As we said in *Higginbotham*, hearsay statements tending to inculpate someone other than the accused must be regarded with suspicion. 298 Minn. at 4–5, 212 N.W.2d at 883. Accordingly, even assuming the relevance of the evidence, the trial court did not abuse its discretion in excluding the evidence as inadmissible hearsay.

▌ b) The other major claim of trial error relates to the prosecutor's closing argument. Glaze argues some of the prosecutor's remarks were intended "to inflame the jury's passion against appellant and to divert the jury from its duty to decide the case on the evidence," which is improper under 1 *Standards for Criminal Justice* § 3–5.8(c) & (d) (2d ed. 1980) ("A.B.A. Standards"). For example, the prosecutor stated, "The crimes that he did, actually [a conviction] will never be enough." and "This defendant has got far better representation than he deserved for what he

did." Glaze also argues the prosecutor improperly expressed his personal opinion in violation of A.B.A. Standards section 3–5.8(b) when he said, "When I think about this case, I'm just outraged."

"In recent years, we have become increasingly concerned about prosecutorial misconduct in criminal trials." *State v. Johnson,* 441 N.W.2d 460, 462 (Minn.1989) (prosecutor's remarks to grand jury found prejudicial); *see also State v. Merrill,* 428 N.W.2d 361, 372–73 (Minn.1988) (prosecutor's closing argument deemed "deplorable"). We consider some of the prosecutor's remarks to constitute unprofessional conduct unbecoming a prosecutor, particularly the statement that Glaze "got far better representation than he deserved for what he did." The state's attorney at oral argument before us conceded as much. Defense counsel did not object at trial to the remarks nor did he bring a mistrial motion on this basis or ask for curative instructions. Prosecutors are officers of the court, however, and we will not hesitate in a suitable case to grant relief in the form of a new trial. We also note that trial courts have a duty to intervene and caution the prosecutor, even in the absence of objection, in appropriate circumstances.

In this case, after some deliberation, we have concluded that a new trial is not warranted. We base this decision on the fact that the remarks were isolated and not representative of the closing argument when reviewed in its entirety and on our determination that, given the overwhelming evidence of Glaze's guilt, it is extremely unlikely the improper remarks influenced the jury or affected the verdict in any way. In this respect, we note the jury acquitted Glaze of the three counts of premeditated murder. *See State v. Matthews,* 301 Minn. 133, 136, 221 N.W.2d 563, 565 (1974) (jury's acquitting defendant of first degree murder and finding him guilty only of lesser offense indicates jury was not prejudicially influenced by improper closing argument).

Glaze also contends the following rulings by the trial court were erroneous: excluding identification testimony offered by the defense of Glaze's alleged look-alike; disallowing inquiry by the defense regarding whether DNA testing was performed in the case; allowing the state to admit evidence of a specific instance of Glaze's prior violence; prohibiting the defense from presenting expert testimony on the factors affecting the reliability of eyewitness identification; instructing the jury that no evidence had been presented about Glaze's violence or nonviolence against other women; instructing the jury that they might be willing to abide by a majority vote; and instructing the jury that they must reach a unanimous verdict. After a careful review of the record, we deem these contentions meritless. Indeed, the lengthy trial generally was conducted professionally, as the trial court noted in commending the attorneys.

In conclusion, our meticulous review of the trial record satisfies us that Glaze received a fair trial and that he was properly convicted of the crimes in question.

Affirmed.

WAHL, Justice, dissenting.

Billy Richard Glaze was tried in one prosecution for the murders of three women, murders committed at different times and different places in the City of Minneapolis. The state's case rested on the theory that these were serial killings. Angela Green, the third of the murder victims, had not been strangled, as had the earlier two victims, but had died by having her skull crushed by a concrete block. There were other differences between the first two murders and the last. Glaze sought unsuccessfully to introduce evidence at trial that someone other than himself had killed Angela Green. As to whether the exclusion of that evidence was in error, the majority states that

> [w]e tend to agree with the defense that the evidence was admissible on the issue of the identity of the person who murdered Green. [But] [g]iven the overwhelming evidence of Glaze's guilt, it is extremely doubtful that admission of more detailed evidence concerning Cooper's relationship with Green would have

affected the verdict. Accordingly, any error by the trial court was harmless beyond a reasonable doubt.

See p. 661. Because the denial of the right to introduce evidence that someone other than defendant committed the crime goes to the very heart of a defendant's right to a fair trial—the right to present a defense to a charge by the state, I respectfully dissent.

The majority recognizes when a defendant seeks to introduce evidence that someone else had cause or opportunity to commit the crime with which the defendant is charged:

> [E]vidence tending to prove that another person did the killing is admissible. The purpose of evidence to show that another committed the homicide is not to prove the guilt of the other person, but to generate a reasonable doubt of the guilt of the defendant. Proper foundation must be laid for the admission of such evidence, however, to avoid the consideration of matters collateral to the crime. 'The rule is that [evidence of such acts] by a third person against the victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime.'

\*  \*  \*  \*  \*  \*

Once the necessary foundation is proven, it is permissible to introduce evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act.

*State v. Hawkins,* 260 N.W.2d 150, 158–59 (Minn.1977) (quoting *Marrone v. State,* 359 P.2d 969, 984 (Alaska 1961)) (other citations omitted). It is clear that in this case the defense had the requisite foundation for the introduction of evidence tending to show that someone other than Glaze was the killer of Green.

The defense had evidence that Michael Cooper, an Afro–American, was Angela Green's pimp and that he wore a "Coors Light" hat. A Coors Light hat was found at the murder scene and forensics revealed that inside the hat were hairs of a negroid type. In addition to the hat, there was evidence that Angela Green had reported to the police that Cooper had raped her at knife point. A knife was found at the murder scene. Additionally, Green had given to her sister a list of people of whom she was afraid, Cooper was on that list. The day before she was killed, Green had told someone she was afraid that Cooper would kill her.

The trial court granted the state's motion in limine seeking to exclude this evidence.[1] Although it is true, as the majority notes, that the jury did get to hear bits and pieces of the evidence concerning Cooper and Green, the majority ignores the fact that the connection between Cooper and Green—the crucial reason for the introduction of the evidence—was excluded from consideration by the jury. The majority then concludes that because the evidence in this case was so overwhelming, any error was harmless beyond a reasonable doubt.

The harmless error standard of review applies to errors involving constitutional rights. *State v. Robinson,* 427 N.W.2d 217, 224 (Minn.1988). Appellant's constitutional right in this case was the most fundamental of all rights of an accused facing murder charges—the right to present evidence of a defense. In order to conclude that the trial court's exclusion of the evidence did not impermissibly abrogate appellant's constitutional right to present a defense, this court must

> independently evaluate the evidence to determine whether or not an average

---

**1.** The trial court relied on cases supplied by the state to exclude the evidence of the connection between Cooper and Green. The cases relied on were *State v. Blanchard,* 315 N.W.2d 427, 432 (Minn.1982) and *State v. Ulvinen,* 313 N.W.2d 425, 427–28 (Minn.1981). These cases stand for the proposition that hearsay statements concerning a homicide victim's fear of a defendant are admissible if the victim's state of mind is a relevant issue, the probative value of the evidence outweighs its prejudicial effect and a proper limiting instruction is given. *Blanchard,* 315 N.W.2d at 432. In this case, however, the evidence was not being introduced to show Green's fear of Glaze, but her fear of a third person.

jury would have changed its verdict had [the evidence] been [introduced]. If the record contains overwhelming evidence of guilt, and the [evidence] was merely cumulative and could not have played a significant role in the jury's conviction, it is harmless.

*Robinson*, 427 N.W.2d at 224.

This evidentiary error deprived defendant of his constitutional right to present a defense. Because I cannot say, as did the majority, that the evidence used to convict Glaze was overwhelming, I cannot conclude that the error was harmless beyond a reasonable doubt. Defendant is entitled to a new trial.