STATE of Minnesota, Respondent,

v.

Erasmo Charles FLORES,
Jr., Appellant.

No. C7–98–760.

Supreme Court of Minnesota.

June 17, 1999.

Steven P. Russett, Asst. State Public Defender, Minneapolis, for appellant.

Michael A. Hatch, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, for respondent.

## OPINION

STRINGER, J.

Appellant Erasmo Charles Flores, Jr. and his cousin C.F. were indicted for first-degree premeditated murder,[1] first-degree felony murder[2] and second-degree intentional murder[3] for the death of Nathan Wood, a 24–year old resident of Windom, Minnesota. The state sought a pre-trial ruling on the admissibility of a statement made by C.F. to his girlfriend S.R. and a statement made by C.F. to appellant's friend Shawn Cary, arguing that the statement to S.R. was in furtherance of a concealment phase of the murder conspiracy under Minn. R. Evid. 801(d)(2)(E), and that the statement to Cary was admissible as an adoptive admission under Minn. R. Evid. 801(d)(2)(B). The trial court ruled that C.F.'s statement to S.R. was admissible because it was in furtherance of the conspiracy, and that appellant manifested an adoption of C.F.'s statement to Cary rendering that statement also admissible. The trial court further ruled that the defense could not introduce evidence implicating a third party, A.J. Olhausen, as a suspect in the murder because there was insufficient evidence to connect him to the crime. Following a jury trial, appellant was found guilty on all charges and now raises these three trial court rulings as error. We affirm.

On Friday night, November 8, 1996, Nathan Wood met a friend, Chris Michalski, at a movie theater. Michalski left Wood at his home at 12:15 a.m. and around 4:30 Saturday morning, Olhausen and his friend Patrick Nelson stopped at Wood's house. The outside light was on but no one answered their knock on the door and they left. They returned a short time later but there was still no response. Michalski came back to Wood's house around 3:00 p.m. to look for his wallet, but again there was no answer to his knock on the door. The blinds on the house were drawn and although Michalski peeked through a gap in the curtains, he was unable to see clearly inside.

Wood's mother stopped at his house late in the morning of Tuesday, November 12 and discovered her son's dead body lying face down on the living-room floor and covered with a blanket. There was a large stab wound in Wood's back and blood all around. Marijuana was scattered around

1. Minn.Stat. § 609.185(1) (1998).

2. Minn.Stat. § 609.185(3) (1998).

3. Minn.Stat. § 609.19(1) (1998).

and on Wood's body, and a broken pocket watch had been placed on his back. The house had been ransacked, a mattress was propped over a front window and the venetian blinds were rotated in a downward position preventing anyone from seeing inside.[4] A number of items were missing from Wood's house, including his leather jacket and wallet, a 12–gauge Remington shotgun and some carpentry hammers. Also missing were Wood's "steam roller" and "pinchy box," paraphernalia used with marijuana.

An autopsy revealed that Wood died from a combination of serious injuries. He had been stabbed at least a dozen times – two stab wounds punctured his liver and two punctured his left lung. One stab wound to the neck was made with such force that it penetrated into the bone of Wood's sternum. A minimum of nine blunt force wounds were inflicted to Wood's skull, one with enough force to penetrate the skull to a depth of one inch. The skull fractures were consistent with being inflicted by a hammer. Wood's hands and thighs had signs of defensive wounds. Wood's throat had been slashed at least twice severing three major blood vessels. The medical examiner testified that the blood evidence found at the home indicated less spattering than might be expected from the slashed arteries indicating that the throat wounds were inflicted as Wood was already dying from other wounds. Although the time of death could not be determined with precision, the condition of Wood's body was consistent with death occurring early Saturday morning, November 9.

Bureau of Criminal Apprehension (BCA) Agent Robert Berg concluded from his investigation that the marijuana placed at the crime scene was intended as a diversion and that the crime was motivated by someone with an intense rage against the victim because of the intensity of the "overkill" exhibited both by the nature of the wounds to the body and the ransacked house. Appellant became a suspect when Wood's friends disclosed that appellant had been upset about a relationship between Wood and appellant's girlfriend S.S. that developed while appellant was in Texas. When appellant returned to Windom from Texas, S.S. disclosed to him that on one occasion she had sex with Wood. Appellant became enraged and repeatedly told S.S. that "he wanted to kill" Wood and that she was the "only thing keeping him alive," and when S.S. was speaking to Wood on the telephone, appellant yelled in the background, "I am going to get you." A friend who was present at the time asked appellant how he was going to get Wood since he had an injured arm. Appellant responded that he had three good arms – one of his and two of his cousin's. The cousin was C.F.

Earlier in the evening before the murder S.S. dropped appellant off at 1133 Drake Street in Windom where he lived with C.F. Around 12:30 a.m., C.F.'s girlfriend S.R. and her friend A.R. returned from a football game and began looking for C.F. They did not find him at 1133 Drake initially, but when they returned to check again around 1:00 a.m., they looked through the front picture window and saw C.F. run into the bathroom without a shirt on. Both girls thought this unusual since the house had no heat and the night was chilly. They also saw appellant run into a bedroom carrying what appeared to be a bundle of clothes. By the time the girls entered the house appellant and C.F. were in the kitchen and both appeared excited. Appellant had a rip in his jeans and told the girls that he and C.F. had gone for a walk and that he ripped his jeans when he fell while racing back to the house. S.R. and A.R. noticed fingernail polish on appellant's jeans and fingernail polish on C.F.'s hands, and that C.F.'s hands were red and

---

**4.** The blinds appeared to have been rotated after the murder, since there was both dust and a splatter of blood on the underside of the slats.

irritated.[5] In addition, C.F. had a fresh cut on his thumb. There was a "long" gun under the kitchen table and a pile of marijuana and two bottles of fingernail polish on the table. When C.F. told A.R. his story about where they had been, A.R. responded that it did not make sense. C.F. snapped, "Shut up, it does, too. Just wait. Read the newspaper. This day is going to go down in history." He refused to explain what he meant but repeated, "Just read the newspaper."

S.R. and A.R. returned to the house on Drake early the next afternoon, November 9. S.R. testified that appellant had a 12–gauge shotgun that she had never seen before, and that she and A.R. accompanied appellant and C.F. to a hardware store where appellant purchased a red pipe cutter. That evening a family friend saw appellant and C.F. sawing off a shotgun using a red pipe cutter identical to the one purchased earlier.

After school on Monday, November 11, C.F. asked S.R. to drive him past Wood's house. S.R. asked him what was going on after they had passed by the house a few times; C.F. responded by asking her if she knew what a specific Spanish word meant. When she said no, he told her that it meant slitting someone's throat and pulling their tongue through it, and that he and appellant had done that to Wood. He then told S.R. that he and appellant had gone to Wood's house early the previous Saturday because appellant was angry over what had happened between Wood and S.S. They planned to break in and when C.F. turned to tell appellant that the door was unlocked, he cut his thumb on appellant's knife. He went on to tell S.R. that Wood was sitting in a chair in the living room when they entered, and that appellant put his knife to Wood's throat and said, "You didn't think I would come back like this, did you?" Wood started to resist, and C.F. hit Wood on the head with

a hammer, knocking him unconscious. Appellant said, "No, not like that, like this," and took the hammer from C.F. and hit Wood so hard that the hammer went right through his skull. C.F. told S.R. that he told appellant they had to get out of there, but appellant said he was not done yet. He then took his knife and cut Wood's throat to make sure he was dead. On their way out, one of them turned on the front light and shut the door so no one would think anything was wrong.

Shawn Cary, a friend of appellant who had been involved in a traffic accident with him on October 23, met C.F. and appellant at the house on Drake Street around 11:30 p.m. on Monday, November 11. Appellant questioned Cary about whether he had talked to the police following the accident. Cary told him no, but that he had sent a message to Wood and received no response. Appellant said that Wood "wouldn't be getting ahold of [Cary] any time soon," and slid Wood's driver's license across the kitchen table to Cary. Cary testified that appellant and C.F. proceeded to describe Wood's murder, and that the narrative "was back and forth between [appellant] and [C.F.]" Cary testified that the two men told him that Wood had been asleep in a recliner when they entered his house late Friday night, but awoke as appellant put his knee on his chest and held a knife to his throat. Appellant told Cary that he was the one with the knife, and that he and C.F. got Wood out of the chair in order to tie him up. C.F. told Cary that "out of nowhere [Wood] went at [appellant]" and appellant grabbed him and told C.F. to hit him. C.F. told Cary that he struck Wood with a hammer and Wood went down. Appellant told Cary that he slit Wood's throat "just to finish it off."

Appellant and C.F. also confessed to stealing certain items from Wood's home, and they then pulled Wood's social security card from a garbage bag and burned it

---

5. Shawn Cary testified at trial that about a year prior to the murder, appellant had told him that if a person put fingernail polish on their fingertips they would not leave fingerprints.

in an ashtray along with other items. Cary also saw a garbage bag which contained what appeared to be clothes and Cary was shown Wood's "steam roller." Appellant and C.F. told Cary they had Wood's leather jacket, and appellant showed Cary Wood's shotgun, which had been sawed off, and his custom-made "pinchy box."

The next day, Tuesday, November 12, S.R. and A.R. stopped by the Drake Street house where they saw a gun barrel wrapped with duct tape sticking out of one of the kitchen drawers and the "steam roller" under the sink. Appellant asked A.R. if he could burn some garbage at her house. She said no because her parents were home and they did not know about her relationship with him. A.R. agreed to drive appellant and C.F. to appellant's sister's apartment in Worthington however, and appellant put a garbage bag into the trunk of A.R.'s car. C.F. told S.R. that the bag contained the clothes he and appellant had worn while committing the murder. When they arrived in Worthington, appellant took the garbage bag out of the trunk and put it into his sister's garage.

Appellant was arrested at the apartment in Worthington on Thursday, November 14 on charges relating to the October automobile accident. He was also a suspect in Wood's murder.[6] Appellant indicated to the arresting officers that he had two leather jackets and wanted to wear the longer one while being taken to jail. The shorter leather jacket was subsequently identified as identical to the jacket missing from Wood's house. The jacket also matched the brand and size of a jacket liner found in Wood's house. Police found a wallet in the pocket of the longer jacket which was identified by Wood's mother as similar to Wood's missing wallet. DNA analysis of blood found on the wallet indicated multiple sources—the predominate source was consistent with Wood's DNA and a lesser amount was consistent with C.F.'s DNA.

Police obtained a search warrant for the garage belonging to appellant's sister and seized the garbage bag appellant had placed there. C.F.'s fingerprints were on the garbage bag and it contained numerous blood-stained articles of clothing as well as documents taken from Wood's wallet including two fishing licenses in Wood's name and business cards from a chiropractor, taxidermists, Wood's mother, and Olhausen. DNA analysis of the blood on the clothing was consistent with the DNA of Wood and C.F. The "pinchy box" also was eventually recovered from the Worthington apartment. The red pipe cutter, a sawed-off barrel of a shotgun and several unused garbage bags were found in a search of the Drake Street house, and a hammer was found in a crawl space off the basement. Red paint found on the shotgun barrel supported the inference that it was cut by the pipe cutter, and the unused garbage bags found in the Drake Street house were indistinguishable from the bag containing the bloody clothes. Analysis of fibers found on the shotgun barrel revealed that they were identical to those found in the lining of the shotgun case found in Wood's house. DNA from blood found on the hammer matched Wood's, and the medical examiner testified that the head of the hammer fit the hole punched in Wood's skull.

## I.

Appellant first asserts that the trial court erred in admitting C.F.'s statement to S.R. arguing it was inadmissible hearsay. We review evidentiary rulings according broad discretion to the trial court and we will not reverse absent a clear abuse of discretion. *State v. Buggs,* 581 N.W.2d 329, 334 (Minn.1998); *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989).

---

6. Although C.F. was not originally a murder suspect, he was in the apartment when the arrests occurred and was taken into protective custody when he was found to be in possession of some marijuana. C.F. was later released to the custody of an aunt.

The trial court admitted C.F.'s statement to S.R. under Minn. R. Evid. 801(d)(2)(E) as a statement of appellant's coconspirator. The Rule provides in part:

A statement is not hearsay if:

* * * *

The statement is offered against a party and is * * * a statement by a co-conspirator of the party. In order to have a coconspirator's declaration admitted, there must be a showing, by a preponderance of the evidence, (i) that there was a conspiracy involving both the declarant and the party against whom the statement is offered, and (ii) that the statement was made in the course of and in furtherance of the conspiracy.

Minn. R. Evid. 801(d)(2)(E).

■ Generally, statements designed to promote the common good of the conspirators are admissible, but simple narrative statements of what happened are not. *See State v. Buschkopf,* 373 N.W.2d 756, 765 (Minn.1985). Statements made within a few days of the crime to a person believed to be a reliable ally for the purpose of constructing alibis for the conspirators are properly admitted under the Rule. *Id.* at 765–66. The same is true of statements made shortly after the crime to a trusted confidant whose aid was being solicited. *State v. Davis,* 301 N.W.2d 556, 558–59 (Minn.1981).

■ The trial court found that there was a conspiracy to conceal the crime and that the statement made by C.F. to S.R. was in furtherance of the conspiracy and therefore was not hearsay under Minn. R. Evid. 801(d)(2)(E). We review a determination of the admissibility of statements allegedly made by a coconspirator in furtherance of the conspiracy by carefully "analyz[ing] the facts of the case to determine if in fact there was an agreement to conceal, to determine the closeness in time of the concealment to the commission of the principal crime, and to determine the reliability of these statements." *Davis,* 301 N.W.2d at 559. The phrase "in furtherance of" is to be broadly construed. *State v. Howard,* 324 N.W.2d 216, 223 (Minn.1982).

In his brief to this court, appellant admits that there was "arguably" sufficient evidence to support a finding of a conspiracy to conceal, but asserts that the trial court erred in finding the statement furthered the conspiracy because S.R. was already assisting C.F. and in fact her continued assistance was *less* likely after she learned of his involvement in the murder. Appellant also argues that C.F.'s statement was a narrative of past events made only to address S.R.'s suspicions and to downplay C.F.'s own involvement in the murder—therefore they were made in C.F.'s own interest and not in the interest of the conspiracy.

■ There was ample evidence that there was an agreement between C.F. and appellant to conceal the crime. A mattress had been moved to cover one window and the venetian blinds on another had been rotated downward to make seeing into the house practically impossible. The front light had been left on to avoid suspicion and the crime scene had been left to give the impression the murder was drug-related. Appellant and C.F. burned papers belonging to Wood, sawed off the shotgun so it would not be recognized, hid the hammer in a basement crawlspace, and arranged to dispose of the bloody clothes and other papers out of town.

There was also ample evidence that C.F.'s statement to S.R. was made in furtherance of the conspiracy. It was made within two days of the murder and before the crime had been discovered, at a time when appellant and C.F. did not have their own transportation and relied upon S.R. for driving them around Windom and to Worthington in their efforts to keep track of the crime scene and to dispose of incriminating evidence. We conclude there was ample evidence for the trial court to find that C.F.'s statement to S.R. was made for the purpose of enlisting her cooperation in concealing the crime.

Thus we hold that the trial court did not abuse its discretion in admitting C.F.'s statement to S.R. under the coconspiratory exception of Rule 801.

## II.

■ Appellant also challenges the admissibility of C.F.'s statement to Cary, made in appellant's presence, about the murder. The trial court held the statement was an adoptive admission and therefore was not hearsay.

A statement is not hearsay if:

\* \* \* \*

The statement is offered against a party and is \* \* \* a statement of which the party has manifested an adoption or belief in its truth \* \* \*.

Minn. R. Evid. 801(d)(2)(B).

■ To be admissible as a statement "adopted" by the defendant as an admission of guilt, and therefore a statement that is by definition *not* hearsay, the trial court must first determine that the defendant exhibited conduct or made statements that were unequivocal, positive and definite in nature clearly indicating that the defendant adopted the hearsay statements as his own. *Village of New Hope v. Duplessie*, 304 Minn. 417, 425, 231 N.W.2d 548, 553 (1975).

Statements made in the presence of the defendant by a coconspirator to a third party naming the defendant as the one who shot the victim were found to be adoptive admissions when the defendant helped describe his own involvement in the murder. *State v. Berrisford*, 361 N.W.2d 846, 850 (Minn.1985). Similarly, an affirmative nod of the head by a defendant when his coconspirator stated "I didn't do it, [the defendant] did" was positive conduct indicating adoption of the statement by the defendant. *State v. Shoop*, 441 N.W.2d 475, 482 (Minn.1989). When implicitly asked to confirm that he had shot a man and a defendant made a gesture "like a gun to the head," this court found the gesture "certainly as definitive as [a] nod

of the head" and affirmed the adoptive admission ruling. *State v. Roan*, 532 N.W.2d 563, 573 (Minn.1995).

Appellant here argues the trial court abused its discretion when it found that appellant had manifested an adoption of C.F.'s statement to Cary because Cary was unclear exactly who said what, and whether appellant actually adopted all the assertions made by C.F. Appellant also argues that Cary's testimony was inherently unreliable because Cary admitted to have been drinking when the statement was being made, and because a plea agreement between Cary and the state on an unrelated charge allegedly gave him a motive to fabricate evidence against appellant.

■ Appellant's arguments about Cary's unreliability due to drinking are misplaced. It is the province of the jury to determine the weight and credibility of individual witnesses and of the defendant's story. *State v. Miles*, 585 N.W.2d 368, 373 (Minn.1998). Cary was thoroughly cross-examined on his potential intoxication and motive to fabricate evidence and there was no proof that Cary's capacity to comprehend what was being said to him was in any way impaired. Nor can the agreement between Cary and the state reasonably be read as requiring the manufacturing of incriminating evidence against appellant, as Cary testified that it was his understanding that he was required to testify truthfully.

Cary testified that the conversation describing the murder went "back and forth between [appellant] and [C.F.]," that it was appellant who produced Wood's social security card when Cary mentioned Wood's failure to respond to his message, and it was appellant who produced Wood's "steam roller" and shotgun to show Cary what objects had been stolen from Wood. Finally, Cary testified that appellant was the one who told him that he slit Wood's throat "to finish [him] off." Under such circumstances, it is unrealistic to expect a

third party witness to remember with specificity which of the two conspirators said what about commission of the crime— what is important for the purpose of an adoptive admission is that by statement or conduct the appellant manifested an adoption of the statement. Appellant did so here by actively participating in the conversation, adding to and embellishing upon the account offered by C.F., and at no time did appellant give any indication that he disagreed with or denied C.F.'s statement. The trial court was well within its discretion in finding appellant adopted C.F.'s admission. We conclude that the trial court did not abuse its discretion in admitting C.F.'s statement to Cary as an adoptive admission under Rule 801(d)(2)(B).

We further note that even if the court did abuse its discretion in admitting either this statement or the statement C.F. made to S.R., the error was harmless beyond a reasonable doubt given the extensive evidence against appellant, including evidence of motive, direct evidence of threats by appellant to the victim, the discovery of items stolen from the victim's home in appellant's possession, DNA evidence connecting the hammer found in appellant's residence with the murder, and evidence of an attempt to dispose of clothes stained with blood that matched the DNA of both the victim and C.F. The statements, at most, simply tie the direct evidence of appellant's guilt into a chronological sequence. It is clear that any error in admitting the statement could not, beyond a reasonable doubt, have contributed to the jury's finding of guilt. We affirm the trial court's ruling admitting the statement against appellant.

## III.

Finally, appellant argues that the trial court erred when it granted the state's motion in limine to prevent the defense from introducing evidence allegedly implicating Olhausen in Wood's murder.

A defendant may seek to introduce evidence of prior bad acts by a third person tending to show that the third person committed the crime with which the defendant is charged. *See* Minn. R. Evid. 404(b); *State v. Spreigl,* 272 Minn. 488, 495–97, 139 N.W.2d 167, 172–73 (1965) (discussing admission of prior bad acts by the *defendant* that tend to prove the defendant committed the crime); *see also State v. Johnson,* 568 N.W.2d 426, 433 (Minn.1997) (discussing the admission of "reverse-*Spreigl*" evidence). The purpose of this evidence is not necessarily to prove that the third person committed the crime; it may be offered simply to raise a reasonable doubt as to the defendant's guilt. *State v. Hawkins,* 260 N.W.2d 150, 158 (Minn.1977).

Before evidence of a third party's prior bad acts may be admitted however, the defendant must lay a proper foundation in order "to avoid the consideration of matters collateral to the crime." *Id.* at 159. Foundation evidence must include proof of facts having an inherent tendency to connect the third person to the commission of the crime. *Id.* Only after a proper foundation is laid may evidence of prior bad acts of a third person be introduced. *Id.*

This court has required some direct evidence placing the third person at the scene of the charged crime before admitting evidence of a third party's prior bad acts. *See State v. Williams,* 593 N.W.2d 227, 233–234 (1999). We have held that sufficient evidence is offered when the third party was a key witness for the state and was by his own testimony connected to the scene of the crime. *Hawkins,* 260 N.W.2d at 160. Physical evidence may also connect a third party to the scene of the crime: in *State v. Glaze,* 452 N.W.2d 655 (Minn.1990), a hat found at the crime scene not owned by the victim but similar to one worn by a third party was sufficient to connect the third party to the crime scene. *Id.* at 661; *see also State v. Anderson,* 379 N.W.2d 70, 80 (Minn.

1985) (evidence showed third person present at crime scene).

 Presence in the general area of the crime however, even though coupled with threats to someone other than the victim, was held to be insufficient foundation. *State v. Fenney*, 448 N.W.2d 54, 62 (Minn.1989). Likewise, evidence that the third person spoke with the victim on the night of the murder was insufficient when the third person had an alibi. *State v. Harris*, 560 N.W.2d 672, 680 (Minn.1997). In our recent opinion in *Williams*, the possibility that the third person called the victim's house on the day of the murder was insufficient foundation to connect that person to the scene of the crime. *Williams*, 593 N.W.2d at 234 (1999)

 Here, the defense offered evidence that Wood owed Olhausen money for drugs, that Olhausen was at Wood's house with Nelson in the early morning hours of Saturday, November 9, 1996, that Olhausen's business card was found in the bag of bloody clothes, and that Olhausen threatened to kill another person who owed him money for drugs within a month of Wood's death. Appellant argues that this evidence, in combination with an inference that the crime was drug-related because of the circumstances at the murder scene, has an inherent tendency to connect Olhausen to the crime.

We agree with the trial court that the Olhausen visit to Wood's house early in the morning of the day of the murder, standing alone, was insufficient evidence to link Olhausen to commission of the crime since it only places Olhausen in the vicinity of the crime. Further, Nelson provided a strong alibi for Olhausen during this crucial period of time. Nor could an inference of presence at the crime scene be drawn from the discovery of Olhausen's business card in the garbage bag, as numerous other papers and business cards were found in the same location including a business card from Wood's mother. The BCA case agent testified that the crime

scene was in fact inconsistent with a drug-related murder because of the "overkill" exhibited both by the nature of the wounds to the body and the ransacked house. The state's case against appellant did not depend upon Olhausen's testimony because he did not testify or provide any key evidence, and there was no scientific evidence to connect Olhausen to the scene. None of the several articles missing from Wood's home were found in Olhausen's possession. Appellant has failed to offer sufficient evidence connecting Olhausen to the crime, and therefore the trial court did not err in excluding this evidence.

We hold that that the trial court acted within its discretion and did not err in admitting in evidence C.F.'s statement to S.R. as a statement by a coconspirator, in admitting in evidence the statement of C.F. to Shawn Cary as an adoptive admission, and in excluding evidence concerning A.J. Olhausen.

Affirmed.