STATE of Minnesota, Respondent,

v.

Craig Michael FRIEND, Appellant.

No. C9–91–2437.

Supreme Court of Minnesota.

Dec. 11, 1992.

John M. Stuart, State Public Defender, Cathryn Middlebrook, Asst. State Public Defender, Minneapolis, for appellant.

Craig Michael Friend, pro se.

Alan Mitchell, St. Louis County Atty., Duluth, Brian D. Simonson, Asst. County Atty., Hibbing, and Hubert H. Humphrey, III, Atty. Gen., St. Paul, for respondent.

## OPINION

KEITH, Chief Justice.

Defendant, Craig Michael Friend, was found guilty by a St. Louis County district court jury of first degree premeditated murder in violation of Minn.Stat. § 609.185, subd. 1 (1990), and felony murder in violation of Minn.Stat. § 609.185, subd. 2 (1990). Defendant was sentenced to life imprisonment for the first degree murder conviction. On appeal, defendant argues that (1) he was denied a fair trial by the admission of certain photographs and a videotape of the crime scene; (2) he was denied his constitutional right to call an expert witness in surrebuttal to refute the state's rebuttal evidence; (3) the trial court abused its discretion by not allowing a defense witness to testify that he had sexual relations with the victim about two weeks prior to her death; (4) the failure to analyze fully the fingernail scrapings from the victim constituted reversible error; and (5) the evidence was insufficient as a matter of law to sustain defendant's conviction. We affirm.

On Saturday, September 23, 1989, the Petrick family went hunting and camping together, but the victim, Kimberly Petrick, stayed home to work that weekend. That night, Petrick and her friend, Kathy Kiel, received a call from defendant and Rick Lampton, and they all decided to meet at Petrick's house. Lampton and defendant arrived between 11:00 and 11:30, and a little while later, Pat Savage and Kevin Hyndman appeared. The group sat around and talked, although defendant admitted that he was somewhat moody and felt out of place, perhaps because the others all worked together. Kiel recalled that the men, but not the women, were drinking.

Shortly after midnight, they ordered a pizza, and defendant, thinking that the pizza was late, took off in his car looking for the delivery man. A few minutes after the pizza was delivered, defendant came back to the party, appearing upset, and told Lampton that he was leaving. Defendant and Lampton then left the party around 12:30 a.m. About 15–20 minutes later, Savage and Hyndman left. Kiel was the last to leave the party, departing around 1:30–1:40 a.m. after helping Petrick clean up the house.

The next day, Kim Petrick failed to show up at work. Kiel became concerned and called the Petrick residence but got no answer. Around 5:30 p.m., the Petricks returned home from their camping trip, and Mrs. Petrick eventually discovered her

daughter's (the victim's) body in an L-shaped position on the side of her bed. Officers and paramedics arrived at the scene and determined that Kim Petrick had been killed by a .22 caliber bullet, which entered her nose and severed her mid-brain, causing instantaneous death. The autopsy revealed that the victim had a large amount of seminal fluid in her vagina and that she had a bruise under one eye as well as smeared blood on the inside of one knee.

That Sunday night, September 24, 1989, Captain Bussey of the Hibbing Police, in conjunction with Agent Bowman of the Minnesota Bureau of Criminal Apprehension (BCA), took statements from various people, including Mr. and Mrs. Petrick, Kiel, Lampton, Hyndman, Savage, and defendant. During this interview, defendant stated that he had not been drinking and did not return to Hibbing that night after leaving the Petrick party.

The investigation continued throughout the ensuing months, and the police, aided by a tip from Kiel that her boyfriend Lampton owned a .22-caliber pistol, called in Lampton for a second interview on January 17, 1990. Lampton admitted that he owned the gun but that he had loaned it to defendant on Saturday, September 23 and had only recently gotten it back from the defendant after repeated requests. He told the police that he and defendant had been pheasant hunting that day in the Gheen/Orr area and that when he tried firing the .22-caliber gun, defendant expressed an interest in buying it. Lampton agreed to give the pistol and ammunition to defendant, with the understanding that defendant would pay for the gun at a later date. After hunting, Lampton and defendant went to parties at Smiley Rock and at Theresa Cianni's cabin. At the Cianni party, defendant and Mike Sushoreba fired shotguns in back of the cabin, which caused Cianni to ask them to leave. Upon leaving Cianni's cabin, they went to the Petrick party.

After completing the interview with Lampton, Officer Bowman re-interviewed defendant. Defendant admitted that he may have gotten the .22-caliber pistol from Lampton that day but that he later gave it back because he did not have any money with which to buy it. He said he owned the .22-caliber pistol for about three weeks, that he kept it in his room, and that no one else had used it. Once again, defendant denied returning to Hibbing or the Petrick residence later that night, stating that after dropping off Lampton and stopping to see Sushoreba, he merely took a second trip around Chisholm and then went straight home. At the time of these statements, Lampton agreed to turn over the pistol to police, and both Lampton and defendant consented to taking blood tests.

The resulting blood tests revealed that defendant was the semen donor, and pubic hairs found at the scene matched those of defendant. Gun testing also revealed that the markings on the .22-caliber cartridge shells found in and around the victim's body matched the firing pin impressions left by the .22-caliber pistol obtained from Lampton. Based on this information, a warrant for defendant's arrest was issued.

On the date of the arrest, November 18, 1990, Agent Bowman confronted defendant with the results of the ballistics and DNA tests, but defendant still denied returning to the Petrick house later that night. However, while in jail, he made various statements to two inmates which indicated that he had committed the murder.

At trial, defendant admitted that he had returned to the victim's house later that night and claimed he had consensual sex with her. He claimed that someone must have grabbed the .22 pistol out of his truck while he was in the Petrick residence, used the gun to commit the murder, and later returned it to his truck.

I.

Defendant asserts that he was denied his constitutional right to a fair trial by the admission of photographs and videotape of the crime scene. Defendant claims that the admission of this evidence proved to be highly inflammatory and prejudicial.

The admission of photographs, however, is a matter left to the discretion of the trial judge. As this court recently recognized:

> These cases make it clear that it is within the trial court's discretion to admit photographs, even ghastly ones, so long as they show something that a witness could describe and are material to some relevant issue. The exhibits in this case allowed the jury to better visualize the crime scene. And the extent and type of harm to the victim is material to the issues of intent and premeditation.

*State v. Hummel,* 483 N.W.2d 68, 74 (Minn.1992). Just because photographs may be graphic does not mean that they must be excluded from evidence. Instead, the longstanding rule regarding the admission of photographs is as follows:

> Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

*State v. DeZeler,* 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950); *see also Hummel,* 483 N.W.2d at 74; *State v. Alton,* 432 N.W.2d 754, 758 (Minn.1988); *State v. Sanders,* 376 N.W.2d 196, 200 (Minn.1985); *State v. Durfee,* 322 N.W.2d 778, 785–86 (Minn.1982).

Here, the trial court reviewed each photograph before admitting it, required an explanation as to the probative value of each questionable photograph, and explicitly balanced their probative value against their potential for creating unfair prejudice. Minn.R.Evid. 403. Thus, the court engaged in the required balancing test under Rule 403 and, in the process, excluded some potentially prejudicial or duplicative photographs.

The photographs received into evidence were relied on by many of the state's witnesses, especially Agent Kaldun from the BCA and Dr. Uncini, the pathologist. Because the state's case was wholly circumstantial, it was important to demonstrate the thoroughness of the investigation. Many witnesses relied on the photos to clarify issues of fact, especially to prove the sexual assault. Similarly, the videotape aided the jury in placing the rooms in the house in context, which became relevant in understanding the location and distances involved at the crime scene. We hold that the trial court followed the balancing test required by Rule 403 and did not abuse its discretion by admitting the photographs and videotape into evidence.

## II.

Defendant next asserts that the trial court abused its discretion in denying the defense's request for a continuance in order to call a surrebuttal witness. We hold that no abuse of discretion occurred.

In three prior statements to police over a 14-month period, defendant denied returning to the victim's house after leaving the party shortly after midnight. At trial, however, defendant claimed, for the first time, that he did return to Hibbing around 1:30–1:45 a.m. and had consensual sexual intercourse with the victim. He claimed that after the sexual intercourse, the victim got dressed and walked him to the door.

In rebuttal, the state offered the testimony of Dr. Thomas Uncini, who stated that, given the amount of seminal fluid in her vagina at the time of the autopsy (3–4 c.c.'s), it was his opinion that the victim did not get up on her feet after the sexual intercourse. He also testified that the seminal stain on the back buttocks portion of the robe corroborated his theory that she did not get up after intercourse because the fluid was flowing backwards and not down her legs. Also, no semen was found on either her undergarments or on her legs.

Following Dr. Uncini's testimony, the defense requested a continuance in order to call Dr. John Plunkett as a surrebuttal witness. The defense claims Dr. Plunk-

ett would have testified that Dr. Uncini's theory had no scientific or medical basis. The court denied the continuance and noted that Dr. Uncini's testimony was admissible either as expert or opinion testimony helpful to the jury. Instead of allowing a continuance, the trial judge allowed Dr. Uncini to be cross-examined further by the defense. Upon further cross-examination, Dr. Uncini admitted that there were no specific scientific studies supporting his opinion but that it was based on his own experience as well as the law of gravity. Given that requests for continuances are governed by the abuse of discretion standard, *State v. Ranier*, 411 N.W.2d 490, 495 (Minn.1987), we hold that the trial court did not abuse its considerable discretion in denying the request for a continuance.

## III.

At trial, the court excluded the testimony of John Kern, who would have claimed that he had consensual sexual relations with the victim approximately two weeks prior to her death. The defense argued that this testimony was relevant to show that any sexual activity between Kim Petrick and defendant was consensual under a "similar pattern" rationale and that the rape shield law should not apply to murder prosecutions.

■ Count II charged defendant with first degree murder in violation of Minn. Stat. § 609.185, subd. 2 (1990), which requires proving that the defendant was committing or attempting to commit criminal sexual conduct in the first or second degree. Both Minn.R.Evid. 412 and Minn. Stat. § 609.347, subd. 3 (1990), state that the rape shield law applies in a prosecution for criminal sexual conduct under Minn. Stat. §§ 609.342–.346. Since the state needed to prove the elements for criminal sexual conduct in the first and second degree delineated in § 609.342 and § 609.343 for Count II, defendant is wrong in arguing the general inapplicability of the rape shield law.

■ The rape shield law limits the admission of evidence of a victim's prior sexual conduct. *State v. Carpenter*, 459 N.W.2d 121, 125–26 (Minn.1990). In certain cases the due process clause, the right to confront accusers, or the right to present evidence will require admission of evidence otherwise excluded by the rape shield law. *See State v. Benedict*, 397 N.W.2d 337, 341 (Minn.1986). This, however, is not such a case.

■ The evidence demonstrated that the victim had a broken nose, had a wound under her eye, and did not get up between the time of the sexual intercourse and the murder. Under Minn.R.Evid. 403, the trial court was free to exclude the evidence without regard to whether exclusion was required by Minn.R.Evid. 412 or the statute. Stated simply, the limited probative value of the evidence was clearly outweighed by its potential for confusing the jury and creating unfair prejudice.

## IV.

■ Defendant argues that the state lost or destroyed the victim's fingernail scrapings and that this constituted reversible error because such evidence might have demonstrated that he did not commit the crime. To succeed in a claim that lost or destroyed evidence constitutes reversible error, a defendant must show that the destruction was intentional and that the exculpatory value of the evidence was apparent and material. *California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984).

■ In this case, neither condition has been met. First, there is no indication that any evidence was destroyed. The pathologist examined the victim's fingernails and reported that he did not find any foreign material underneath them. Even if the scrapings were later lost, the record contains no claim that the state intentionally destroyed them or acted in bad faith. *State v. Renier*, 373 N.W.2d 282, 287 (Minn.1985). Second, defendant did not demonstrate any potential exculpatory value in the scrapings. In fact, the pathologist and BCA agent at the autopsy observed nothing significant on the scrapings, and the BCA lab analyst testified that fin-

gernail scrapings are usually unreliable. Defendant also had an opportunity to cross-examine the pathologist regarding the procedures he followed and to raise doubts to the jury about whether these procedures were properly administered. *Trombetta,* 467 U.S. at 490, 104 S.Ct. at 2535. Thus, no reversible error was committed.

## V.

Finally, defendant contends that the evidence was insufficient as a matter of law to sustain his conviction on two counts of first degree murder. There is, as our summary of the evidence demonstrates, no merit to this contention.

Affirmed.