STATE of Minnesota, Respondent,

v.

Lue LEE, Appellant.

No. C7–01–1046.

Supreme Court of Minnesota.

June 20, 2002.

John M. Stuart, Minnesota State Public Defender, Jodie L. Carlson (# 218637), Assistant State Public Defender, Minneapolis, MN; for Appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, MN, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig (# 65730), Assistant Ramsey County Attorney, Saint Paul, MN, for Respondent.

## OPINION

GILBERT, Justice.

This case involves several alleged erroneous evidentiary rulings and alleged misconduct by the prosecutor. Appellant Lue Lee's estranged wife, Xia Vang, was murdered by a single shotgun blast to her head on November 25, 2000. Steven Yang was indicted for first-degree murder for firing the fatal shot and appellant was indicted for first-degree murder for allegedly aiding and abetting Yang. A jury found appellant guilty of first-degree murder and the trial court imposed a mandatory life sentence. This appeal followed. We affirm.

At about noon on November 25, 2000, appellant was with his estranged wife Xia Vang and their daughter in Mounds Park when a masked gunman approached and shot Vang in the head one time with a shotgun. Appellant dialed 911 and Saint Paul police officer Carl Schwartz responded to the call. Upon arriving at the park, Schwartz observed a female body lying near the monument in the park whose "head was blown off" and noticed that her brain was lying on the seat of the monument. Schwartz also saw appellant crouched behind the monument, crying and holding his daughter tightly.

Schwartz asked appellant what happened. Appellant stated that he met Vang and their daughter in the park to take

photographs for their daughter's second birthday. Appellant said that he was taking a photograph when a dark blue or black Toyota pulled up and someone wearing a black ski mask, black shirt, black shorts and white tennis shoes and carrying a shotgun ran towards them. Appellant ducked behind the monument with his daughter and heard a shot fired. He then called 911.

Other officers arrived at Mounds Park shortly after Schwartz's arrival. These officers videotaped and took still photographs of the scene and of Vang's body. The officers also found a piece of shotgun wadding near Vang's body. It was later determined that Vang's death was caused by a single shot from a sawed-off shotgun fired at her head from about 3–4 feet away.

Appellant and his daughter were transported to the Saint Paul Police Homicide Unit about an hour after the shooting. Once there, Sergeant Joseph Younghans began interviewing appellant, who was not under arrest. This interview lasted approximately 6 hours. During the interview appellant said that he and Vang had been separated for about 6–7 months and that he was behind on his child support payments. Appellant again explained that he was in Mounds Park with Vang and their daughter to take pictures for their daughter's second birthday and that he did not know who shot Vang. Younghans questioned appellant about a domestic assault on Vang that occurred on July 3, 1999, specifically asking Lee if it was an "assault five."[1] Appellant denied that the incident was an "assault five" but later admitted that he had beaten Vang on two occasions and that he had threatened to kill her.

While Younghans was questioning appellant, other police officers continued to investigate in and around Mounds Park. The officers eventually located a Toyota Camry near the park, which the officers believed might have been involved in the crime. The car was running, the rear window had been smashed, and inside the officers found a water bottle, a screwdriver, and a Motorola walkie-talkie. The officers also obtained a search warrant for appellant's apartment, where they found a screwdriver similar to the one found in the Toyota.

All of this information was relayed to Younghans. He asked appellant if he ever communicated with a walkie-talkie. Appellant indicated that he used walkie-talkies with his roommate and then produced a Motorola walkie-talkie from his pants pocket. Thereafter, Younghans suspected that appellant was involved in Vang's murder and continued to question him about the walkie-talkies. The walkie-talkie from the Toyota was brought to the police station while Younghans was still questioning appellant and Younghans was able to determine that both walkie-talkies were the same make, model, and color, were both set on the same channel, and were able to communicate with each other. Despite repeated questioning, appellant continued to deny any involvement in Vang's murder.

The police again questioned appellant the following day, after they arrested and interviewed two other suspects in Vang's murder, Thao Vue and Steven Yang. Younghans told appellant how both Vue and Yang implicated appellant in Vang's murder but appellant continued to deny any involvement. However, appellant eventually told Younghans that he and Yang had planned to scare Vang at the park by

---

**1.** Presumably, Younghans was referring to a misdemeanor assault in the fifth degree, which is defined as either committing an act with intent to cause fear in another of immediate bodily harm or death or intentionally inflicting or attempting to inflict bodily harm upon another. Minn.Stat. § 609.224, subd. 1 (2000).

having Yang rob appellant and Vang. Appellant also said that he and Yang stole the Toyota and that the plan was for appellant to signal Yang with the walkie-talkie as to when Yang should come "scare" Vang. Appellant told Younghans that Vue's role was to help as a driver.

Appellant was indicted for first-degree murder in violation of Minn.Stat. §§ 609.185(1), 609.11 and 609.05 (2000) for allegedly aiding and abetting in Vang's murder.. Yang was also indicted for first-degree murder.[2] Vue pleaded guilty to second-degree murder in exchange for his testimony at appellant's and Yang's trials.

At appellant's trial, Vue testified that appellant asked him to help kill Vang on more than one occasion.[3] According to Vue's testimony, a day or two before Vang's murder Yang used a screwdriver to steal a Toyota Camry to be used in the murder. Appellant drove the stolen car to the Mounds Park area and Vue and Yang followed in appellant's car. The stolen car was then left near Mounds Park. According to Vue, appellant planned to meet Vang and their daughter on November 25, 2000 and then have his plan to kill Vang carried out.

Vue testified that he left his house with appellant and Yang on the morning of November 25, 2000 and went to Thai Thao's house. On their way to Thao's house appellant called Vang and told her to bring their daughter to Mounds Park. After arriving at the house, appellant ob-

tained permission to borrow Yong Thao's car. Appellant left the house in his car, stopping to buy some toys and balloons for his daughter and then at a gas station, while Vue and Yang followed in Yong Thao's car. From the gas station appellant headed to Mounds Park, while Vue and Yang continued to follow. According to Vue, appellant planned to meet Vang and their daughter in Mounds Park and hit the panic button on his walkie-talkie to signal Yang when it was clear to enter the park and kill Vang. Vue further testified that appellant purchased batteries for the walkie-talkies a day before the murder.

Several other witnesses testified for the state. Za Thao, Vang's mother, testified through an interpreter that she was at a Hmong New Year celebration when she learned that "Lue killed my daughter." When the prosecutor asked what kind of person Vang was she stated that her daughter "obey me all the time and she helped me all the way 'til Lue killed her.'" The prosecutor also showed Za Thao a picture of Vang and her daughter, asking if she recognized it. She responded, "This is my daughter Xia that Lue killed." Appellant did not object to any of this testimony.

Kia Vang, Xia Vang's sister, testified that during appellant's relationship with Xia, appellant would push, punch, and kick Xia, even when she was pregnant. She also testified about an incident in July 1999 where Xia ended up being taken to Re-

---

**2.** Yang was tried and convicted for his role in Vang's murder approximately 3 weeks after appellant's conviction. We affirmed Yang's conviction in *State v. Yang*, 644 N.W.2d 808 (Minn. 2002).

**3.** Vue testified that there was two different plans to kill Vang. First, appellant and Yang planned to carjack Vang and her roommate when they returned home from a club, take them to Wisconsin, and then kill them. Vue

was to follow in appellant's car and then drive appellant and Yang back to Saint Paul after Vang and her roommate were murdered. According to Vue, this plan was aborted when Vang parked her car in the front of the house and returned with three other people instead of just her roommate. Vue drove off, fearing too many witnesses. The second plan was carried out on November 25, 2000.

gions Hospital by ambulance as a result of a cut on her head from appellant throwing a phone at her. Appellant did not object to these particular statements. The state also introduced two photographs of Xia Vang taken after the July 1999 assault.

Two men who were housed with appellant in the adult detention center after his arrest also testified. Zang Xiong testified that appellant admitted that he had planned the murder with Yang and Vue and that he had Vang killed because he did not want to pay $600 per month in child support. Xiong further testified that appellant described how he signaled Yang with the walkie-talkie. The second man, Elronza Williams, testified that appellant initially told him that he was being framed for Vang's murder but later confessed that he planned to kill Vang, signaled Yang with a walkie-talkie, and wanted the crime to look like a robbery. Williams also testified that appellant told him that it was his gun that was used in the shooting.

The state introduced several exhibits at trial. Specifically, the state offered several letters written by appellant while in jail implicating him in Vang's murder and indicating that he was trying to get Vue to back up his story. The state also introduced, over appellant's objections, five photographs of Vang at the crime scene, five autopsy photographs showing Vang's disfigured head, two autopsy photographs of Vang's hand showing that parts of two fingers were missing as a result of the shotgun blast, and a videotape taken of the crime scene.

Appellant did not call any witnesses but did request and receive an instruction for unintentional second-degree murder while committing or attempting to commit second-degree assault. The jury returned a guilty verdict on the count of first-degree murder. This appeal followed.

Appellant alleges that he was denied his fundamental right to a fair trial because of several evidentiary rulings by the trial court and pervasive misconduct by the prosecutor. Specifically, appellant alleges that the trial court erred by allowing evidence of other crimes and by admitting shocking and cumulative visual evidence showing Xia Vang's fatal head wound. Furthermore, appellant alleges that the prosecutor engaged in misconduct by persisting to ask questions after the trial court sustained appellant's objection, by failing to adequately prepare a witness, and by making improper statements during the state's closing argument.

## I.

■■■ Evidentiary and procedural rulings generally rest within the discretion of the trial court and this court will not reverse absent a clear abuse of discretion. *State v. Glaze,* 452 N.W.2d 655, 660 (Minn. 1990). A defendant claiming the trial court erred in admitting evidence bears the burden of proving the admission was erroneous and prejudicial. *State v. Rhodes,* 627 N.W.2d 74, 84 (Minn.2001). In determining whether an error warrants reversal, the test is whether it is likely that the errors substantially influenced the jury to convict. *Glaze,* 452 N.W.2d at 660 (quotation and citation omitted). "We are also mindful that '[c]onstitutional error is not reversible error, however, if it is found harmless beyond a reasonable doubt.'" *Id.* (quoting *State v. Larson,* 389 N.W.2d 872, 875 (Minn.1986)).

### Evidence of past abuse

Appellant first claims that the trial court erroneously admitted relationship evidence without following the proper protective procedures. Some of the admitted evidence contested by the appellant relates to what may have been a prior crime, i.e.,

Younghans' testimony about an "assault five" on July 3, 1999 and Kia Vang's testimony about this assault. Other evidence alleged to be improperly admitted did not relate to this assault, i.e., Kia Vang's testimony that she had, on more than one occasion, seen appellant push, punch, and kick Xia Vang. Relying on *State v. Langley*, 354 N.W.2d 389 (Minn.1984), the trial court ruled at the beginning of the trial that evidence related to appellant's prior acts of violence against Xia Vang were relevant but could be subject to a foundation objection during trial.

■ Evidence that pertains to the relationship between a defendant and a homicide victim may be admissible in criminal prosecutions even if it refers to other crimes. *Langley*, 354 N.W.2d at 397; *State v. Salas*, 306 N.W.2d 832, 836 (Minn. 1981). Relationship evidence related to a defendant's past abuse of a victim is not admissible to prove character in order to show that defendant acted in conformity with that character, but may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *State v. Williams*, 593 N.W.2d 227, 236 (Minn. 1999) (quotation and citation omitted); Minn. R. Evid. 404(b). For such abuse evidence to be admissible, the state must provide clear and convincing evidence that the defendant committed the prior abuse and must show that the probative value of the evidence is not outweighed by its potential for unfair prejudice. *State v. Buggs*, 581 N.W.2d 329, 336 (Minn.1998); Minn. R. Evid. 403. As with other evidentiary rulings, we generally defer to the trial court's discretion in admitting such evidence and will reverse only upon a showing of clear abuse of discretion. *Buggs*, 581 N.W.2d at 336.

■ As discussed above, Kia Vang took the stand and testified about seeing appellant push, punch, and kick Xia Vang on more than one occasion as well as appellant's assault of Xia Vang on July 3, 1999. Appellant did not object to this testimony or to the admission of the two photographs taken on July 3, 1999 showing how Xia Vang looked as a result of appellant's assaultive behavior. Failure to object to the admission of evidence generally constitutes waiver of the right to appeal on that basis unless the admission of evidence constituted plain error and affected the defendant's substantial rights. *State v. Vick*, 632 N.W.2d 676, 684–85 (Minn.2001). In order to show substantial rights were affected, the defendant bears a "heavy burden" of persuasion to show that "the error was prejudicial and affected the outcome of the case." *State v. Griller*, 583 N.W.2d 736, 741 (Minn.1998). Even if the defendant meets this burden, we must still decide whether we should address the issue in order to "ensure fairness and the integrity of the judicial proceedings." *Id.* at 740. Furthermore, a defendant's contentions that a trial court's cautionary instruction was inadequate or that a cautionary instruction should have been given at the time the evidence was received are deemed forfeited on appeal if not raised before the trial court. *See State v. Ford*, 322 N.W.2d 611, 615 (Minn.1982).

■ Appellant neither objected to Kia Vang's testimony nor requested a cautionary instruction at the time her relationship testimony was offered. Therefore, the question before us as to Kia Vang's testimony is not whether the trial court abused its discretion in allowing Kia Vang's testimony but whether the trial court plainly erred in such a way that affected appellant's substantial rights. *See Vick*, 632 N.W.2d at 685; *see also State v. Mills*, 562 N.W.2d 276, 284 n. 6 (Minn.1997) (recognizing that the defendant's objection that testimony was improper was waived on

appeal because he failed to object at trial); *Ford,* 322 N.W.2d at 615 (recognizing that a defendant's contention that a cautionary instruction should have been given at the time the evidence was received is deemed forfeited if not raised before the trial court).

Appellant claims that the trial court erred because it did not determine whether the testimony offered by Kia Vang was clear and convincing. However, Kia Vang's testimony that she had, on more than one occasion, seen appellant push, punch, and kick Xia Vang is eyewitness testimony, thereby satisfying the clear and convincing prong. *See Williams,* 593 N.W.2d at 236. Furthermore, the pictures of Xia Vang after the July 3, 1999 assault corroborated Kia Vang's testimony about this assault. This again is clear and convincing evidence that an assault occurred. For these reasons, we hold that the trial court did not commit plain error by admitting Kia Vang's relationship testimony.

■■■■■ Appellant also argues that the trial court erred in allowing Younghans to testify that appellant had denied being involved in an "assault five" with Xia Vang but had nevertheless admitted to beating Vang on two separate occasions and threatening to kill her. While appellant did object to Younghans' testimony, his objection was overruled. Younghans' testimony was clearly relevant to show the history of the relationship between appellant and Vang and any statements about appellant beating his wife and threatening to kill her were appellant's own admissions

and were therefore admissible. *See* Minn. R. Evid. 801(d)(2). While appellant asserts that the court failed to consider whether the probative value of the relationship evidence outweighed its prejudicial effect, the record indicates that the amount of relationship evidence admitted was minimal and not excessively explicit or inflammatory. *See Buggs,* 581 N.W.2d at 336. Furthermore, the court provided a cautionary instruction at the end of the trial regarding the testimony about the July 3, 1999 incident, telling the jury, "whatever you find about the events of July 3, 1999, should not be used to convict the defendant." Under these facts, we hold that the trial court did not clearly abuse its discretion by allowing Younghans' testimony to be admitted at trial.

*Admission of photographs and crime scene videotape*

■■■■ We next consider appellant's argument regarding the admission of the crime scene videotape and photographs from both the crime scene and autopsy.[4] The admission of photographs is in the discretion of the trial court. *State v. Robinson,* 539 N.W.2d 231, 239 (Minn.1995). We established the standard for admissibility of photographs in *State v. DeZeler,* 230 Minn. 39, 41 N.W.2d 313 (1950), which held:

> Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a

---

**4.** Appellant argues that he asserted at trial that the photographs and videotape were irrelevant because he did not dispute that Vang died instantaneously as a result of a shotgun wound to her head. However, appellant's counsel conceded before trial that appellant could not simply stipulate away the state's right to introduce relevant evidence at trial. Accordingly, appellant's contention that the

photographs and videotape were irrelevant because appellant stipulated to how Vang died contradicts appellant's own recognition at the pretrial hearing that he could not simply stipulate away the state's right to introduce relevant evidence. While appellant did object, his objections at trial were based solely on their duplicative and prejudicial nature.

verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

*DeZeler*, 230 Minn. at 46–47, 41 N.W.2d at 319 (emphasis in original). We have recognized that photographs that clearly illustrate the crime scene and/or wounds to the victim are relevant even where the defendant is not challenging the elements of premeditation and intent because the state still has the burden of proving these elements to convict of murder in the first degree. *State v. Jobe*, 486 N.W.2d 407, 417 (Minn.1992). At the same time, we have indicated that:

A photograph or videotape should not be admitted if it is only subtly different from other photographic or video evidence. And such exhibits should be limited to a reasonable quantity. The purpose of visual evidence is to inform jurors, not shock and overwhelm them.

*State v. Hummel*, 483 N.W.2d 68, 74 (Minn.1992).

Here, appellant argues that one or two photographs showing the position of Vang's body lying in the snow and one autopsy photo showing the clean head wound would have been sufficient to assist the jury in understanding the testimony describing the death scene and to show the severity of Vang's wounds. The state sought to introduce seven of the thirty autopsy photographs at the pretrial hearing, contending that these were helpful and necessary for the medical examiner's testimony. The judge questioned the prosecutor about each of these seven photographs and why they were necessary. Five of the photographs were of Vang's disfigured head and two were of her hand.

Ultimately, the court allowed these seven photographs to be admitted at trial.

The state also sought to introduce several photographs taken at the crime scene. The court allowed five photographs of Vang at the scene to be admitted but did not allow several others, finding that some of the pictures "cross[ed] that line that I am trying to keep the balance with." The record indicates that the court examined each photograph in an attempt to "draw a line which creates a passion of prejudice and that which is actually useful to proving the principles in the line here." As for the video, the court indicated that it would give some latitude in allowing its use because the videotape showed the crime scene but also indicated that it did not want the video to be stopped while it was being shown to display the still photographs. Instead of two or three photographs of Vang's head and/or body, which appellant argues would have been acceptable, the state was able to introduce ten such photographs (five from the crime scene and five from the autopsy), as well as two autopsy photographs of Vang's hand and the crime scene videotape.

The record indicates that the crime scene photographs and videotape were used to assist in the testimony about the crime scene and the autopsy photographs were used to assist the medical examiner's testimony about the cause of death. The record shows that the trial court carefully reviewed each photograph before admitting it, required an explanation from the state as to the probative value of each photograph, and explicitly indicated an intent to balance their probative value against their potential for creating unfair prejudice. Given these facts, we hold the trial court did not abuse its discretion by admitting the photographs and videotape. *See State v. Friend*, 493 N.W.2d 540, 544 (Minn.1992).

## II.

Next, appellant contends that the prosecutor committed misconduct by (1) persisting in asking witnesses to express their opinion about appellant's demeanor after the shooting after the trial court sustained appellant's objections, (2) allowing Za Thao to volunteer inadmissible opinion testimony about appellant killing Vang, and (3) making several inappropriate comments during closing argument. However, appellant only objected to the prosecutor's questioning of witnesses about appellant's demeanor after the shooting—failing to object either to Za Thao's testimony or to comments made during closing argument.

 When a defendant fails to object to a prosecutor's statement, the defendant typically forfeits his right to have the issue considered on appeal. *State v. Sanders*, 598 N.W.2d 650, 656 (Minn.1999). While certain cases may warrant a new trial due to prosecutorial misconduct even where the defendant failed to object at trial, we may decline to consider an appellant's prosecutorial misconduct claim altogether when there is substantial evidence against the defendant ensuring that the alleged misconduct was harmless beyond a reasonable doubt. *State v. McDonough*, 631 N.W.2d 373, 389 (Minn.2001). Given the facts of this case and the fact that appellant did not object to the prosecutor's questioning of Za Thao or to his closing argument, we decline to address appellant's prosecutorial misconduct claims as to these issues.

 Appellant did object to the testimony regarding his demeanor after the shooting and these objections were sustained. Appellant claims that despite this ruling the prosecutor continued to ask witnesses to express their opinion about appellant's demeanor following the shooting. Appellant argues that this was misconduct because such questions were asked to create the inference that appellant was of bad character and the type of person who would be involved in plotting a murder.

 It is prosecutorial misconduct for the prosecutor to persist in asking questions that the trial court has ruled improper or to elicit evidence ruled inadmissible. *See State v. Harris*, 521 N.W.2d 348, 354 (Minn.1994). The general standard for determining whether a new trial is warranted due to prosecutorial misconduct is "whether the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that defendant's right to a fair trial was denied." *State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980).

While the record indicates that the prosecutor continued to ask witnesses about appellant's demeanor after appellant's objections to such questioning had been sustained, these objections were sustained on foundation grounds. The trial court never ruled that the questions were improper or were asked in an attempt to elicit inadmissible evidence. Nothing in the record indicates that the prosecutor's questions were so inexcusable or prejudicial that appellant's right to a fair trial was denied. Accordingly, we hold that the prosecutor did not commit misconduct in his questioning of any of the witnesses about appellant's demeanor after the murder.

For the foregoing reasons, we hold that appellant is not entitled to a new trial and affirm his conviction.

Affirmed.

LANCASTER, J., took no part in the consideration or decision of this case.