**STATE of Minnesota, Respondent,**

v.

**Thomas Ray JACKSON, Appellant.**

No. C6–02–335.

Court of Appeals of Minnesota.

Jan. 28, 2003.

Mike Hatch, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN; and Roger S. Van Heel, Stearns County Attorney, Cloud, MN, (for respondent).

John M. Stuart, State Public Defender, Rochelle R. Winn, Assistant State Public Defender, Minneapolis, MN, (for appellant).

Considered and decided by
SHUMAKER, Presiding Judge,
LANSING, Judge, and MINGE, Judge.

## OPINION

GORDON W.SHUMAKER, Judge.

Appellant challenges his conviction of being a felon in possession of a firearm and his 60-month prison sentence, arguing that the district court denied him his right to a fair trial because the court refused to admit hearsay evidence from two defense witnesses who stated that a third party admitted selling the gun that appellant was charged with illegally possessing. Appellant argues that the third-party admissions should have been admitted as statements against penal interest because the third party was also barred from possessing the gun. We reverse.

## FACTS

Appellant Thomas Ray Jackson was ineligible to knowingly possess, transport, or receive a firearm because of a prior felony conviction of terroristic threats. Minn. Stat. § 624.713, subd. 1(b) (2000). The state prosecuted Jackson for possessing a pistol, and a jury found him guilty.

Jackson's defense was that it was not he, but rather his companion, Joseph Miles, who possessed and sold a pistol to a bartender. After the sale, Miles told a deputy sheriff that Jackson sold the gun. A few months later, Miles told fellow jail inmates, James Stanley, Evan Dixon, and Louis Borgen, that he had falsely accused Jackson, and in fact it was he who sold the gun.

When the case came to trial, Miles could not be found. The state introduced evidence of Miles's accusation that Jackson sold the gun. Jackson sought to introduce Miles's contradictory jail statement about the false accusation, but the district court sustained the state's hearsay objection. At issue in this appeal is the propriety of the court's preclusion of evidence of Miles's contradictory jail statement. The salient facts from the trial testimony and related proceedings of record follow.

On February 18, 2001, Thomas Ray Jackson met Joseph Miles, an acquaintance, in a St. Cloud bar. When Miles revealed that he was down on his luck, out of work, and living at the Salvation Army, Jackson invited him to come and live at Jackson's home for two months. Jackson also said he would get a job for Miles. Miles accepted, and the men drove to pick up Miles's belongings.

After they arrived at Jackson's house, Miles produced from his belongings a gun case containing a pistol. Because Jackson was a convicted felon and ineligible to possess firearms, he told Miles that the pistol

could not be in the house. Miles replied that he intended to sell it anyway and asked if he could keep it in the garage. Jackson asked his wife's opinion, and she said the pistol could not be anywhere on the premises.

Jackson told Miles that he knew of a nearby "biker bar" where the pistol might be sold. The men then left in Jackson's car, picked up a third person, and drove to Doochie's Bad Company Bar in St. Martin.

Once inside the bar, Jackson approached the owner, Douglas Salzl. Jackson testified that he told Salzl that his roommate, whom he introduced, had a pistol for sale, and, when Salzl said he was interested in seeing the gun, Miles went out to the car and brought the gun into the bar. Salzl's version was that Jackson said he was a felon and could not have a gun and that it was Jackson who went outside and brought a pistol back into the bar.

Salzl inspected the pistol and inquired, "Does it fire?" Miles said that it did, and Jackson testified that he replied, "Yeah, it fires, we shot it." Then Salzl, Miles, and Jackson went outside behind the bar so that Salzl could test-fire the pistol. Salzl fired numerous shots into a small refrigerator outside the back door of the bar. Deputy Lehmkuhl, an off-duty sheriff and friend of Salzl's, testified that he had been drinking a few beers when he heard what sounded like fireworks, looked out the back door, saw Salzl, and went back inside the bar because there did not appear to be a problem outside. When Salzl, Miles, and Jackson returned inside the bar, Salzl offered $100 for the gun, but Jackson negotiated a price of $125. Salzl paid that price, and Jackson kept $20.

About a week after the gun sale, Jackson "bounced" a $100 check at Doochie's bar. Later, when Salzl saw Jackson in town and attempted to approach him about the bad check, Jackson drove away so as to elude him. Jackson never paid the check.

About two weeks after the gun sale, Jackson learned that Miles was trying to sell a ring at Doochie's bar. Hearing a description of the ring, Jackson called home and discovered that Miles had stolen his wife's ring. Jackson called the police, and deputy sheriff Timothy Meland came to Jackson's home to investigate. When Meland questioned Miles, he admitted that he took the ring, and Meland gave him a citation for theft. Jackson told Miles to get his belongings and leave. Meland agreed to drive Miles to the Path Recovery Center in St. Cloud.

Meland testified that during the trip to St. Cloud, Miles "mentioned that Mr. Jackson had sold a semiautomatic handgun to the bartender of Doochie's bar." Jackson did not object to this testimony. In later testimony, sheriff's detective Pam Jensen repeated Miles's accusation, stating that "Joseph Miles told Deputy Meland that Jackson sold a gun to Douglas Salzl at the bar." Jackson did not object to Jensen's testimony.

Miles's accusation launched an investigation into Jackson's alleged gun sale. When a deputy asked Salzl about the sale, he said he bought a gun from someone named Joe. Later, Salzl selected Jackson's photograph from an identification array as the person who sold the gun.

Detective Jensen confronted Jackson with Miles's accusation. Jackson denied selling the gun and said that someone named Jason had sold it. In a later discussion with Jensen, Jackson said that Josh was involved in the sale.

At trial, Jackson explained why he gave information about Jason and Josh. Jackson stated that Josh was Josh Rode, an acquaintance, who Jackson knew to be a convicted felon. Jackson said that Rode

owned the gun before Miles obtained it and he did not want to get Rode in trouble by disclosing that Rode was involved in the gun sale.

Before the trial began, the district court heard the state's motions in limine to exclude the testimony of Stanley, Dixon, and Borgen, proposed defense witnesses. The court allowed Stanley to testify, and he stated during the trial that Josh Rode had introduced him to Miles and that Miles was in a bar on February 16, 2001, trying to sell a gun. The court sustained the state's hearsay objection to the testimony of Dixon and Borgen, finding the hearsay evidence to be unreliable. These men and three others were in jail with Miles about two months before the trial. Dixon told an investigator that Miles related to the inmates his experience with Jackson and said he falsely told the police that Jackson was the owner of the gun. Miles stated that he was upset with Jackson because of the stolen-ring incident. Borgen told the investigator that Miles said he sold a gun and a stolen ring to a bartender and that Miles "was very cocky and was acting like he got the best of Thomas Jackson" because Jackson had been charged with selling the gun.

After the state completed its case-in-chief, Jackson renewed his request to be allowed to present the testimony of Dixon and Borgen. The state objected, and the court sustained the hearsay objection.

## ISSUE

Did the district court err by excluding evidence of a third-party admission as unreliable hearsay in light of contradictory hearsay evidence admitted without objection at trial and where credibility of witnesses is a central, dispositive issue?

## ANALYSIS

The state's position at trial and on appeal is that Miles's jail statement was inadmissible hearsay. The district court agreed. Jackson contends that the statement is admissible under a traditional hearsay exception, and the court's preclusion of the statement violated his right to due process.

■■■ Rulings on the admissibility of evidence at trial are generally left to the district court's discretion and will not be overturned absent an abuse of that discretion. *State v. Gates*, 615 N.W.2d 331, 337 (Minn.2000). Even when a criminal defendant alleges a violation of his constitutional rights because of an evidentiary ruling, this court reviews the ruling for an abuse of discretion. *State v. Tovar*, 605 N.W.2d 717, 722 (Minn.2000).

■■■ When an out-of-court statement made by an unavailable declarant is offered into evidence in a criminal trial to help establish an accused's guilt, hearsay, due-process, and Confrontation Clause issues emerge. *See State v. Henderson*, 620 N.W.2d 688, 696–97 (Minn.2001) (noting that out-of-court statement may be admitted into evidence without violating Confrontation Clause if the statement is necessary and reliable); *see also State v. Keeton*, 573 N.W.2d 378, 382 (Minn.App. 1997) (stating that due process is upheld when corroborative evidence indicates that an out-of-court statement admitted as a result of waiver to hearsay objections was not "totally lacking" in reliability). Generally, constitutional protections will not preclude the admissibility of a hearsay statement that may be allowed under a firmly rooted exception to the hearsay rule. *State v. King*, 622 N.W.2d 800, 808 (Minn.2001).

1. *First Hearsay Statemen*

During the state's case-in-chief, the jury heard twice that Joseph Miles, a person

who was present when the gun was sold, identified Jackson as the seller. First, Deputy Meland testified to this hearsay accusation without objection. Then, also without objection, Detective Jensen recited double hearsay, testifying that Meland told her that Miles had told the deputy that Jackson sold a gun to Salzl.

■ Although we have found no definitional category or exception that would allow Miles's hearsay accusation into evidence, there was no contested issue about this statement at trial nor is there one on appeal. We therefore begin by recognizing that hearsay admitted into evidence without, or over, objection becomes substantive evidence in a trial. *See McNab v. Jeppesen,* 258 Minn. 15, 18, 102 N.W.2d 709, 711–12 (1960) (stating that when otherwise inadmissible opinion evidence is admitted without objection at trial, the evidence must be given probative force because the plaintiff is limited on appeal to objections raised during trial proceedings). Early in the trial, the jury learned that not only had Miles accused Jackson of selling a gun, but also that the deputy sheriff found the accusation sufficiently credible to expend official time and effort investigating it. The first hearsay statement thus provides the context for analyzing Miles's later contradictory assertion and for assessing the likely overall impact of this inadmissible hearsay statement.

The state downplays the significance of this first hearsay statement, arguing that it did not base its case on Miles's accusation, but rather relied on Salzl's testimony to prove the charge. Although the record shows that the state did emphasize Salzl's testimony, the prosecutor did not ignore Miles's statement. In his final argument, the prosecutor characterized Salzl as his *main* witness, but also called the jury's attention to Miles by recalling that two law-enforcement officers "told you that

this mysterious Joe Miles guy happened to mention a gun sale at Doochie's Bad Company Bar* * *." Of course, the jury had heard not only a mention of a gun sale, but also an accusation that Jackson was the seller.

Earlier in his final argument, the prosecutor suggested to the jury:

> [m]aybe you want to hear from Joe Miles, maybe you want to hear from Josh Rode, but that's not evidence, it wasn't presented in court. You heard their names come up, *you can consider what the evidence was about those two gentlemen.*

(Emphasis added.)

The jury had heard more than Miles's name come up. Part of the evidence about Miles was that he accused Jackson of selling a gun.

Despite the state's emphasis of Salzl as its main witness, when the jury deliberated it had before it accusations by two people, only one of whom had appeared at trial and was cross-examined. Of course, we do not know what evidence persuaded the jury to find Jackson guilty. We do not know if the testimony of Salzl alone was sufficient or if the jury needed the corroborative statement by Miles to reach its verdict. When a case involves one person's word against another's, it seems reasonable to think that a jury will be less skeptical of an accusation if two unrelated accusers with firsthand knowledge corroborate each other in identifying the perpetrator of a crime.

The likelihood of a corroborative effect of Miles's accusation is even more plausible when we consider that the state itself was less than fully confident in the credibility of its main witness. The prosecutor began to signal his concern in his opening statement when he described the gun sale:

Mr. Douglas Salzl of Doochie's bar will tell you he paid $125 for it. You'll probably hear that *Doochie's isn't the best place. You might hear some things about Douglas Salzl,* who is also known as Doochie.

(Emphasis added.)

In his final argument, the prosecutor again mentioned the possibility of hesitation in accepting Salzl's testimony: "Now, when you first got a look at Douglas Salzl, my thought, wow, this is the State's witness?" The prosecutor then argued that, despite first-impression reservations about Salzl, the state's main witness had appeared to give sincere and truthful testimony. Yet, the suggestion of Salzl's negative image continued: "I don't call him *Mr. Salzl* to try and clean him up * * *," and Salzl is "[m]aybe not the kind of guy any of us want to hang around regularly." (Emphasis added.)

Despite Salzl's negative image, the prosecutor seemed satisfied with Salzl's trial testimony after all. However, we do not know that the jury found the state's main witness alone to be sufficiently credible to convict Jackson. When we couple Salzl's image with the trial evidence that Jackson's "bounced check" arguably gave him a motive to get even with Jackson, it seems that the jury could reasonably have had reluctance to rely solely on Salzl's testimony in finding Jackson guilty.

Credibility was the central, dispositive issue in this prosecution. With the state showing tentativeness in arguing the credibility of Salzl, and with evidence that Salzl had a motive to falsely accuse Jackson, Miles's unequivocal accusation of Jackson as the seller of the gun became critically significant.

## 2. *Second Hearsay Statement*
### *Rule 804(b)(3) exception*

An out-of-court statement offered to prove the truth of a matter asserted is hearsay. Minn. R. Evid. 801(c). Jackson offered Miles's exculpatory statement to prove its truth. For that purpose, the statement was hearsay.

Subject to exceptions, hearsay evidence is inadmissible. Minn. R. Evid. 802. One exception allows the admission of a hearsay statement by an unavailable declarant if the statement would so expose the declarant to criminal liability that a reasonable person would not have made it unless it were true. Minn. R. Evid. 804(b)(3). Traditionally called a declaration against penal interest, the statement, if offered to exculpate the accused, is admissible only if corroborating circumstances clearly indicate the statement's trustworthiness. *State v. Higginbotham,* 298 Minn. 1, 5, 212 N.W.2d 881, 883 (1973).

The attorneys and the court accepted the propositions that Miles was unavailable within the meaning of rule 804(a) and that he was a convicted felon who was likely to be sent to prison if he possessed a pistol. *See* Minn. R. Civ. P. 804(a) (defining "unavailability as a witness"). With these preconditions satisfied, Miles's jail statement met the requirements of rule 804(b)(3). But because Jackson was offering the statement to exculpate himself, he had to point to corroborating circumstances that clearly indicated the trustworthiness of the statement. *See Higginbotham,* 298 Minn. at 5, 212 N.W.2d at 883. The district court properly assumed the duty of determining whether there had been a sufficient showing of trustworthiness to admit the statement into evidence. Minn. R. Evid. 104(a).

The state characterized the statements of Miles, Dixon, and Borgen as "jailbirds talking about jailbird talk" and argued that Dixon's and Borgen's stories were rehearsed: "A rehearsed story. I believe in rehearsal. I believe you can get a bunch

of people together to learn their lines together; that's hearsay." The district court found the requisite corroborating circumstances lacking and ruled that Miles's jail statement was inadmissible.

However, neither the state in its argument nor the court in its ruling distinguished the issue of the credibility of Dixon and Borgen from the trustworthiness of Miles's statement. These are separate and distinct matters.

■ The credibility of trial witnesses is the domain of the trier of fact. *Henderson*, 620 N.W.2d at 705. Accordingly, if Dixon and Borgen had testified, they would have been subject to cross-examination and impeachment. Wigmore placed unflinching confidence in cross-examination, calling it "that great instrument for discovery of lies." 4 Wigmore, *Evidence* § 1263 at 518 (3d ed.1940). Thus, the credibility of the reporters of Miles's exculpatory statement was not an issue for the court to consider in determining whether there were circumstances that corroborated the trustworthiness of the statement. *See United States v. Seeley*, 892 F.2d 1, 3 (1st Cir.1989) (it is not necessary to make a special assessment of the credibility of an in-court witness who relates an out-of-court statement against penal interest because that is a matter for the jury).

The rule 804(b)(3) issue before the district court related to the sufficiency of circumstances themselves to corroborate the trustworthiness of Miles's exculpatory statement. Weinstein states the test as follows.

> The court should only ask for sufficient corroboration to "clearly" permit a reasonable man to believe that the statement might have been made in good faith and that it could be true.

4 Weinstein & Berger, *Weinstein's Evidence*, § 804(b)(3)[03]; *see also United States v. Lopez*, 777 F.2d 543, 554 (10th Cir.1987).

■ Among the circumstances to consider were: (1) Miles had direct personal knowledge of the gun sale; (2) Miles did not merely exculpate Jackson but inculpated himself as well; (3) the statement was volunteered and spontaneous and was not part of an investigation or interrogation; (4) the statement was made in the presence of five people; any of whom presumably could have been called to verify the statement; (5) two hearers of the statement reported basically the same content; (6) there is no evidence of threats or promises or other coercive circumstances to cause Miles to exculpate Jackson; (7) there was no suggestion that the two reporters of the statement knew or had any connection with Jackson or received or were promised any incentive to exculpate Jackson; (8) Miles had no motive to exculpate Jackson; on the contrary, he had a motive to inculpate him; and (9) although Miles made a prior contradictory statement, he gave a plausible explanation, namely, that he made the prior statement out of vindictiveness against Jackson.

These circumstances sufficiently corroborated the trustworthiness of Miles's jail statement to allow it into evidence. It would then be up to the jury to evaluate both Miles's credibility and the veracity of the statement. Therefore, it was error for the district court to preclude Miles's statement under rule 804(b)(3).

3. *806 Admissibility*

After the state's case-in-chief, Jackson renewed his request to be allowed to present the testimony of Dixon and Borgen, and the district court stated:

> If the issue is whether it was said or not I would permit it * * * but the issue

isn't whether it was said or not, the issue is whether what was said is reliable * * *.

Despite the court's response, Jackson persisted in urging the rule 804(b)(3) exception. Allowance under that exception would, of course, make Miles's jail statement substantive evidence. *See* Minn. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered to prove the truth of the matter asserted). But the court correctly indicated that the statement would be admissible for another purpose. This purpose would be impeachment, because Miles's jail declaration would be inconsistent with his initial accusation. *See State v. Carillo*, 623 N.W.2d 922, 928 (Minn.App.2001) (stating that out-of-court statement offered for impeachment purposes falls outside the hearsay rule), *review denied* (Minn. June 19, 2001). Furthermore, Miles himself disclosed the lack of veracity of the initial accusation by indicating it was false.

The vehicle for the admission of Miles's jail statement when Miles himself was not available is rule 806. That rule provides:

> When a hearsay statement * * * has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported by any evidence which would be admissible for those purposes if the declarant had testified as a witness.

Minn. R. Evid. 806.

Rule 806 is directed to the credibility of the absent hearsay declarant who, in effect, has become a witness in the trial and who has provided substantive evidence in the case. Because of the admission of the declarant's hearsay statement, the accused has been deprived of the opportunity to cross-examine this "witness." Rule 806 offers at least the opportunity to impeach the declarant.

█ The principal impeachment that would be accomplished here if the jail statement were admitted would be a showing of a prior inconsistent statement. The theory of the prior inconsistent statement as impeachment is that the witness has made two contradictory declarations and that fact raises doubt not only as to the veracity of one statement over the other, but as to the witness's personal credibility as well. Edward W. Cleary, et al., *McCormick on Evidence*, § 34 at 68 (2d ed.1972). According to McCormick,

> the witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore.

*Id.* § 251 at 603.

Jackson did not raise the rule 806 issue either at trial or on appeal, but the court itself alluded to the possibility of admissibility that would fit under that rule. We make this brief rule 806 analysis to show that even if Miles's jail statement did not satisfy the criteria for admissibility under rule 804(b)(3), it was clearly admissible under rule 806, and, in the context of this case, where credibility was fragile and determinative, the statement should have been allowed.

### 4. Harmless–Error Analysis

█ The state concedes that a criminal defendant must be given "a meaningful opportunity to present a complete defense." *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984)).

If the jury likely would have reached the same verdict had the evidence of Miles's jail statement been admitted, any error in its exclusion was harmless. *State v. Ses-*

*sions,* 621 N.W.2d 751, 756 (Minn.2001). On the other hand, if

> there is a reasonable possibility that the verdict might have been different if the evidence had been admitted, then the erroneous exclusion of the evidence is prejudicial.

*State v. Post,* 512 N.W.2d 99, 102 (Minn. 1994).

We have already noted that credibility was the central, dispositive issue in this case. The jury had before it an accusation by Miles, as substantive evidence, that Jackson sold the gun. The jury also had before it a statement by Salzl, as substantive evidence, that Jackson sold the gun.

Had the jury known that Miles, without apparent inducement or provocation, admitted that he sold the gun and then falsely accused Jackson of doing so, the jury might have believed Miles's confession. This possibility becomes all the more reasonable when we consider that the state intimated that Salzl, the main witness, had a less than a sterling character and when we recognize that Salzl had a motive, like Miles, to falsely accuse Jackson. The error in excluding Miles's jail statement was prejudicial.

### 5. *Jackson's pro se arguments*

Jackson argues in his pro se brief that the district court in various ways violated his due-process rights, that the state violated discovery rules, and that he received ineffective assistance of counsel. He also raises one issue regarding a sentencing reference, for which he has no transcript. Without a transcript, there is nothing for this court to review. *See* Minn. R. Civ. App. P. 110.01 (stating record on appeal includes papers filed in district court, exhibits, and transcript).

For the majority of Jackson's listed issues, he does not "argue" the issue in the "argument" portion of his brief, nor does he provide legal analysis or support. An issue that is not addressed in the "argument portion" of a brief is deemed waived on appeal. *In re Application of Olson for Payment of Services,* 648 N.W.2d 226, 227 (Minn.2002). *See also Balder v. Haley,* 399 N.W.2d 77, 80 (Minn. 1987). Notwithstanding that the majority of his listed issues are not properly argued, we address Jackson's pro se arguments relating to due process and discovery that appear to be addressed in his argument and his claim of ineffective assistance of counsel.

First, Jackson generally argues that his due-process rights were violated in various ways, including that he was not allowed to provided a complete defense; Deputy Lemkuhl did not testify that he witnessed the crime, did not withdraw himself for conflict of interest (because he was the bar-owner's friend), and committed perjury on the stand; and the state submitted last-minute witnesses.

The majority of Jackson's brief is an argument challenging the credibility of Lemkuhl and Salzl. Jackson argues in his brief that he wanted to show the jury that Lemkuhl and Salzl were biased witnesses and that their testimony was not reliable. The credibility of a witness, however, is for the jury to evaluate, and this court assumes that, after proper consideration, the jury believed the state's witnesses and disbelieved the defendant's witnesses. *Henderson,* 620 N.W.2d at 704.

Jackson also argues that his due-process rights and discovery rules were violated because the district court did not allow evidence of Salzl's criminal history into evidence. Evidence of a witness's conviction is admissible for impeachment purposes if the crime "involved dishonesty or false statement, regardless of the punishment." Minn. R. Evid. 609(a)(2). But

convictions of lesser offenses not involving dishonesty or false statement are inadmissible. Minn. R. Evid. 609(a) 1989 comm. cmt. And the rule places a limit of ten years based on the assumption that, because of the length of time since the conviction occurred, the conviction does not provide effective probative value on the question of the witness's credibility.

At trial, Salzl stated that he "got a felony for buying a TV and a stereo about 17 years ago." Jackson also wanted to admit evidence that Salzl had pleaded guilty on recent charges of assault in the fifth degree and disorderly conduct. But Salzl was not charged with a felony, and the district court determined that the assault/disorderly conduct incident was not relevant to the current case. Under the rules of evidence, there was no error or abuse of discretion in the district court's ruling.

Jackson further argues that evidence of his criminal record was presented at trial and that many of his convictions are stale. Jackson has the burden to prove that the evidence of his prior convictions was erroneous and prejudicial. *State v. Lee,* 645 N.W.2d 459, 465 (Minn.2002). In determining whether an error warrants reversal, the test is whether it is likely that the error substantially influenced the jury to convict. *Id.*

Under Minn. R. Evid. 609(b), any evidence of a conviction older than ten years is stale and inadmissible. Jackson's preplea sentencing worksheet reveals that Jackson has one conviction for theft that is dated September 1986. The remainder of the convictions listed dated from April 1992 through February 2000. Under the rule, the only apparent stale conviction is the theft in 1986. It appears from the record that evidence of his criminal history was revealed on direct examination by his own attorney and that Jackson's trial strategy was to establish his prior criminal record as one basically involving theft without violence. On these facts, Jackson's brief reference to his criminal history was not prejudicial.

Finally, Jackson claims that he was denied effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, Jackson must prove that his counsel's representation fell below an objective standard of reasonableness, and that, but for counsel's errors, the outcome would have been different. *Roby v. State,* 547 N.W.2d 354, 356 (Minn.1996) (quotation omitted). "There is a strong presumption that a counsel's performance falls within the wide range of reasonable professional assistance." *Hale v. State,* 566 N.W.2d 923, 927 (Minn.1997). Aside from alleging that his counsel failed to represent his best interests and was inadequate in his representation, appellant offers no substantive argument as to why counsel was ineffective. After fully considering Jackson's pro se arguments, we conclude that they are without merit.

## DECISION

The district court erred when it excluded evidence of a third-party admission as unreliable hearsay in light of contradictory hearsay evidence admitted without objection at trial.

**Reversed.**